Nick Krammer *et al.*, Plaintiffs-Appellees, *v.* Edward Hines Lumber Co., Defendant-Appellant—(Bird Scaffolding Company *et al.*, Defendants.)

(No. 55016;

First District (3rd Division)—January 3, 1974.

Kralovec, Sweeney, Marquard & Doyle, of Chicago (Edward Scoby, of counsel), for appellant.

Philip H. Corboy, Warren J. Hicken, and Sidney Z. Karasik, all of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The plaintiffs, Nick Krammer and Richard Walgurski, brought an action against Bird Scaffolding Company, Charles Carlson its president, and Hines Lumber Company, for personal injuries sustained when a 24-foot plank that formed the outside rail of a scaffold upon which they were standing broke, causing them to fall. The scaffold was constructed by Bird and the plank forming the side rail was purchased from Hines. A verdict was returned against all the defendants, with Krammer's damages

assessed at $30,000 and Walgurski's at $100,000. Only Hines elected to appeal.

The plaintiffs were tuck-pointers employed by Alfred Anderson & Sons, which engaged in the building cleaning and tuck-pointing business. The Anderson firm purchased the scaffold from Bird in October 1962. The scaffold was called a "tuck-pointer's stage" and was 24 feet long and 28 inches wide. It was constructed with two side rails, each made from a 24-foot long, 2 & 6 inch, Douglas fir plank. By the time Bird used them to build the scaffold, trimming by both Hines and Bird had reduced the planks' dimensions to approximately 1⅜ inches x 5½ inches. Bird also drilled holes into the wide faces of the side rails at intervals of approximately one foot and hickory rungs were inserted into them. Nails were driven down through the side rails and into the rungs to secure them in place. Slats were then riveted with 3/16th inch rivets to the rungs to form a decking which made it possible to walk upon the scaffold. A ¼ inch slot was also made along the bottom of each side rail, into which was placed a No. 9 galvanized steel wire to provide added strength to the rails.

In November 1962, less than a month after purchasing the scaffold from Bird, Anderson returned it for repairs. However, from that time until the accident no further repair work was necessary. On September 4, 1963, Krammer and Walgurski were scheduled to tuck-point a building located at 509 West Wrightwood, Chicago. They inspected the scaffold by examining its rails, hickory rungs and slats, and one of the men jumped upon it. After the scaffold was thoroughly checked by them it was positioned on the building. The men had a trowel, a mortar board, two half buckets of mortar, and a five-gallon pail containing about one gallon of water with them on the scaffold. After they began working, they lowered the scaffold two or three times; all at once they heard a crack as a side rail gave way, and they lost their balance and fell to the ground.

■■ Hines contends that the board it furnished to Bird was not defective; that the board came within the specifications of the order placed by Carlson, Bird's president, and that it cannot be held liable for injuries resulting from Bird's alterations or misuse of the board. Manufacturers, sellers and suppliers are held to strict liability for any injury or damage caused by unreasonably dangerous products which one or all of them place in the stream of commerce. (*Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 210 N.E.2d 182; *Wright v. Massey-Harris, Inc.* (1966), 68 Ill.App.2d 70, 215 N.E.2d 465.) The theory of strict liability is also applicable to suppliers of multi-purpose products which are placed in the stream of commerce with knowledge of the product's intended use (*Texaco, Inc., v. McGrew Lumber Co.* (1969), 117 Ill.App.2d 351, 254

N.E.2d 584) and lumber sold from a lumber yard may be considered a product for purposes of strict liability. (*Housman v. C. A. Dawson & Co.* (1969), 106 Ill.App.2d 225, 245 N.E.2d 886.) There is no question that the plaintiffs' injuries resulted from the breaking of the side rail of the scaffold made from the plank furnished by Hines. For the plaintiffs to recover from Hines under the strict liability theory of their complaint they had to prove that their injuries resulted from a condition of the plank, that the condition was an unreasonably dangerous one, and that it existed at the time it left Hines' control. *Sweeney v. Matthews* (1968), 94 Ill.App.2d 6, 236 N.E.2d 439.

Products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in the light of their nature and intended use. (*Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill.2d 339, 247 N.E.2d 401.) Dr. Charles Walters, a staff member of the University of Illinois, Department of Forestry, testified for the plaintiffs. He stated that Douglas fir is used for many different purposes because of its strength. He said the West Coast Lumber Inspection Association developed standards for grading lumber. Lumber graded "C and Better," such as the plank which broke, is merely appearance graded; its load bearing capacity has not been adjudged. For example, the number of knots permissible in grade C and better lumber is severely limited; in a 24-foot piece only four knots no larger than three-quarters of an inch are allowed.

Arthur Muschler, the technical director of Hines, testified that a high percentage of C and better lumber could be used as a rail in a tuck-pointer's stage scaffold; however, if used for structural purposes in a scaffold, the C and better Douglas fir would have to be properly selected. This, Muschler stated, could be done by measuring the straightness of the grain of the board and by counting the number of annual rings produced per inch. Walters testified that if the grain of the wood does not run parallel to the axis (obtained by drawing a straight line down the center of the wood), it is termed cross grained. The slope of the grain is calculated in terms of the ratio of deviation of the grain in inches as measured along a certain length of the axis. A beam with a slope of grain of one inch for every eight inches has only 53% of the strength of a beam that is straight grained. The slope of grain in the side rail of the scaffold was one inch in six inches. With such a ratio, over half of the bending strength of the wood is lost and it is no longer considered suitable for structural purposes. When asked whether the plank, when it left the lumber company for use in a scaffold, contained a condition which would make it dangerous or likely to cause injury, Walters testified that the cross grain was a defect. He explained that there was a

causal relationship between the cross grain of one inch in six and.the cracking and breaking of the side rail of the scaffold.

Carlson testified that he purchased Douglas fir from Hines in grades C and better and "B and Better" because lumber in these grades contained less knots and imperfections. Before using a piece of Douglas fir in a scaffold he stated he would examine it both for the straightness of the grain and to determine the number of ring lines that were present. He testified that lumber used in scaffolding was not tested as far as stress goes. However, evidence was presented that "stress rated" structural lumber was available for scaffold use.

■■ It has been stated by this court that a supplier can be free from all negligence in selling a product, and a manufacturer can be most careful in making or testing it, but both can be held accountable if a defect unknown to them existed in the product at the time it was made or sold. (*Sweeney v. Matthews.*) At the trial, possible uses for the plank were suggested in which the defect in the grain probably would not have proven injurious. However, whether the plaintiffs' injuries were caused by a defect in the lumber or by its misuse was an issue to be resolved by the jury. *Housman v. C. A. Dawson & Co.* (1969), 106 Ill.App.2d 225, 245 N.E.2d 886.

Hines insists that it should not be held liable for injuries resulting from the use of the plank, which conformed to the standards of C and better lumber, because it was impossible for it to anticipate the use to which the plank would be put. Hines was the principal supplier of lumber to Bird during 1962 and 1963, and Robert Meyers, Hines' salesman, had sold lumber to Bird since 1960. He had visited Carlson at Bird Scaffolding, and Carlson had met him at the lumber yard many times. Carlson discussed the nature of Bird's business with Meyers as well as the various sizes of lumber to be used in scaffolds. Carlson testified that Meyers made suggestions concerning the use of the different types of lumber for a scaffold. Meyers, on the other hand, denied advising Carlson of the type of lumber he should buy and stated that he went to see Carlson merely to show an interest in the business.

■■■ Although when Hines sold the plank to Bird it may not have intended that it should be used as a stress bearing member of a scaffold, this court has recognized a distinction between the intended use of the product and its foreseeable use and has held that it is the standard of foreseeability which controls rather than the manufacturer's intention. (*Dunham v. Vaughan & Bushnell Mfg. Co.* (1967), 86 Ill.App.2d 315, 229 N.E.2d 684.) Considering the history and character of the business relationship between Hines and Bird Scaffolding, whether Hines could have foreseen the use to which the lumber was to be put with the

consequent risk of injury, and at the least warned against it, was a question of fact for the jury.

Hines argues, however, that it was improperly prevented from introducing oral and written demonstrative evidence to apprise the jury of the wide variety of lumber which Bird purchased from it. It asserts that owing to the diversity of Bird's purchases it could not foresee that all the lumber was to be used for scaffolding or ladders. The jury was informed that Bird bought southern yellow pine, hemlock, and spruce in addition to Douglas fir. Also, Meyers testified that Bird ordered 1 x 8's in southern pine, 5¼ inch nose stepping as well as 2 x 4's in hemlock and fir, and 4 x 8 Douglas fir. That the jury was not informed of Bird's purchase of garden grade redwood or lumber in the dimensions Hines suggests were unsuitable for scaffolds was not reversible error. The jury had sufficient evidence before it to determine whether Hines could have foreseen that the plank might be used as a side rail in a scaffold.

Hines further asserts that it should not be held liable because of Bird's alterations of the plank in order to incorporate it into the scaffold. When the plank was delivered to Bird its dimensions were 5½ inches x 1⅝ inches. Thereafter, Bird trimmed the width of the board by about ¼ inch, drilled holes in it for the insertion of hickory rungs, and made a lengthwise slot in the bottom into which was placed the galvanized wire. There was testimony, however, that the rungs and wire served to strengthen the scaffold. As already noted, whether the injuries resulted from a misuse of the plank was a question for the jury. Having reviewed the evidence we find no reason to substitute a different decision for that of the jury.

The judgment will be affirmed.

Affirmed.

McNAMARA, P. J., and McGLOON, J., concur.