RICHARD DUBIN *et al.*, Plaintiffs-Appellants, *v.* MICHAEL REESE HOSPITAL AND MEDICAL CENTER, Defendant-Appellee.

First District (2nd Division)   Nos. 78-81, 78-895, 78-896 cons.

Opinion filed July 17, 1979.—Rehearing denied September 5, 1979.

Anesi, Ozmon, Lewin and Associates, Ltd., of Chicago (Mark Novak, of counsel), for appellants.

Lord, Bissell and Brook, of Chicago (Hugh C. Griffin, Williams P. Dorr, and Harold L. Jacobson, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Is X-ray radiation when administered by a hospital a service, or is it a product under the concept of strict tort liability as set forth by *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, and its progeny? This is the sole question raised on these consolidated appeals by plaintiffs, Richard Dubin, Carla Gifford, and Joan Debra Kurlan, who appeal the orders of the circuit court of Cook County dismissing the strict product liability counts of their complaints against defendant Michael Reese Hospital and Medical Center.

On April 19, 1976, August 13, 1976, and January 5, 1978, respectively, plaintiffs Gifford, Dubin, and Kurlan filed complaints alleging, *inter alia*, that they had developed malignancies as a result of doses of X-ray radiation[1] they had received at the defendant hospital during the years 1947 (Dubin) and 1951 (Gifford and Kurlan). The first counts of each complaint were based on a negligence theory of recovery. The defendant was granted summary judgment on these counts in each case. No issue is raised in this appeal with respect to this action.

Count II of plaintiffs Gifford and Dubin's complaints and count III of plaintiff Kurlan's complaint alleged that the defendant prepared, manufactured, distributed, supplied, and/or sold certain X-radiation and caused it to enter their bodies. Each plaintiff further alleged that such X-radiation was in a condition not reasonably safe for its acknowledged and intended purposes in that the defendant failed to warn him that the product is a carcinogen which generates and causes lesions, tumors, and other cellular abnormalities in human beings. The defendant's motions to dismiss the foregoing strict liability counts asserted that no product was involved, but rather the rendering of a hospital service to which the doctrine of strict liability in tort had allegedly not been extended. The trial court dismissed count II of plaintiffs Gifford and Dubin's complaints and count III of plaintiff Kurlan's complaint.[2] It is from these dismissals that the plaintiffs appeal.

## I.

The evolution of the doctrine of strict liability in tort has been arduous. (See *Suvada*, 32 Ill. 2d 612, 615-21.) Those responsible for its development have not been a little influenced by the nature of the injury-

---

[1] The complaints use the term "X-ray radiation." From our research we think the term "X-radiation" can be appropriately used in this opinion. X-radiation is that radiation composed of X-rays. Webster's Third International Dictionary 2645 (1971).

[2] Count II of plaintiff Kurlan's complaint based on a *res ipsa locquitor* theory was also dismissed; however, the plaintiff does not appeal that dismissal.

causing product involved. Thus, the first cases to abolish the privity requirement of *Winterbottom v. Wright* (Exch. 1842), 10 M. & W. 109, 152 Eng. Rep. 402,[3] involved "imminently" or "inherently" dangerous articles such as poisons which in their normal operation were implements of destruction. (See W. L. Prosser, *The Assault Upon The Citadel (Strict Liability To The Consumer)*, 69 Yale L.J. 1099, 1100 (1960); *Thomas v. Winchester* (1852), 6 N.Y. 397, 57 Am. Dec. 455.) Later, this exception to the privity requirement was extended to include any article which if negligently manufactured was reasonably certain to place life and limb in danger. (*MacPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 389, 111 N.E. 1050.) The first decisions to depart from the general rule of no liability in the absence of both negligence and privity of contract involved the sale of food and drink. These were for the most part premised on implied warranty theories. (See, *e.g., Patargias v. Coca-Cola Bottling Co.* (1st Dist. 1947), 332 Ill. App. 117, 127-33, 74 N.E.2d 162; Prosser, at 1103-10.) The first draft of section 402A of the Restatement (Second) of Torts recognized strict liability in tort only for the sale of food. (Tentative Draft No. 6, section 402A, Restatement (Second) of Torts (April 1961).) Some jurisdictions extended such implied warranties to products intended for intimate bodily use such as hair dye (see, *e.g., Graham v. Bottenfield's, Inc.* (1954), 176 Kan. 68, 269 P. 2d 413), and the next tentative draft of section 402A extended its coverage to such products (Tentative Draft No. 7, section 402A, Restatement (Second) of Torts (April 1962)). Finally, noting the judicial extension of the rule of strict liability "to cover the sale of any product which, if it should prove to be defective, may be expected to cause physical harm to the consumer or his property" (comment *b*, section 402A, Restatement (Second) of Torts (1965)), the drafters of section 402A extended the rule to "*any product* sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer" (emphasis added) (comment *d*, section 402A, Restatement (Second) of Torts (1965)).

A "product" has been defined as "a thing produced by labor" or "anything obtained as a result of some operation of work, as by generation, growth, labor, chemical reaction, study, or skill" (*State v. Steenhoek* (Iowa 1970), 182 N.W.2d 377, 379, citing Random House Dictionary of the English Language 1148 (1966), and Funk and Wagnalls 1977 (1933)); something " 'produced by nature or the natural processes * * *' " (*State ex rel. Spillman v. Interstate Power Co.* (1929), 118 Neb. 756, 770, 226 N.W. 427); and " 'something produced by physical labor or intellectual effort' " (*In re Answer of Minnesota Power & Light Co.*

---

[3] In *Winterbottom* there developed a general rule of non-liability to consumers or users of a product where they were not in contractual privity with the manufacturer. Frumer and Friedman, Products Liability §5.01 (1976).

(1970), 289 Minn. 64, 73, 182 N.W.2d 685, 691, citing Webster's Third New International Dictionary 1810 (1961)). Although the framers of section 402A gave no indication that a meaning of the word "product" other than its general meaning would limit the application of the doctrine of strict liability in tort, a few Illinois courts considering the issue of what is or is not a product for strict liability purposes have so limited section 402A's application.

Noting Dean Prosser's observation that "all types of products are obviously to be included" (Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, 805 (1966)), the court in *Housman v. C. A. Dawson & Co.* (4th Dist. 1969), 106 Ill. App. 2d 225, 245 N.E.2d 886, had no difficulty in holding that lumber was a product for purposes of a products liability case (*Housman*, 106 Ill. App. 2d 225, 229). This case was subsequently followed in *Texaco, Inc. v. McGrew Lumber Co.* (1st Dist. 1969), 117 Ill. App. 2d 351, 356-57, 254 N.E.2d 584, and *Krammer v. Edward Hines Lumber Co.* (1st Dist. 1974), 16 Ill. App. 3d 763, 765-66, 306 N.E.2d 686, in which lumber was also held to be a product within the meaning of section 402A despite its multipurpose nature.

Thereafter followed *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 447, 266 N.E.2d 897, in which our supreme court stated:

> "Comment *e* to the above Restatement section [402A] provides that 'Normally the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. *The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to liability here stated.*' (Emphasis supplied.) [Citation.] While whole blood may well be viable, human tissue, and thus not a manufactured article of commerce, we believe that it must in this instance be considered a 'product' in much the same way as other articles wholly unchanged from their natural state which are distributed for human consumption. [Citations.]"

The next case to consider this issue was *Whitmer v. Schneble* (2d Dist. 1975), 29 Ill. App. 3d 659, 331 N.E.2d 115, in which a dog was found not to be a product within the meaning of section 402A. There the court found:

> "* * * [B]efore the doctrine of *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, may be applied, its nature must be fixed when it leaves the manufacturer's or seller's control.

\* \* \* The purpose of imposing strict liability is to insure that the costs of injuries resulting from defective products are borne by those who market such products rather than by the injured persons, who are powerless to protect themselves [citations]. This purpose would be defeated if *Suvada* were to be applied to products whose character is shaped by the purchaser rather than the seller. Yet quite obviously, a dog's character is affected by its owner's personality, their treatment of it, the affection, indifference or even brutality shown to it. The dog also changes with maturity, with maternity, and as a result of outside events." *Whitmer*, 29 Ill. App. 3d 659, 663.

In *Lowrie v. City of Evanston* (1st Dist. 1977), 50 Ill. App. 3d 376, 365 N.E.2d 923, the issues were whether a multilevel open air garage and a parking space within that garage were products within the meaning of section 402A. In that case, the court rejected the dictionary definition of the word "product" in favor of a definition based on the policy considerations underlying the strict liability concept as expressed in comment *c* of section 402A:

" 'On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.' (Restatement (Second) of Torts, Explanatory Notes §402A, comment *c*, at 349-50 (1965).)" *Lowrie*, 50 Ill. App. 3d 376, 383.

Upon a consideration of these policy reasons, this court held that neither the building nor the parking space was a product within the meaning of section 402A. (*Lowrie*, 50 Ill. App. 3d 376, 384-85.) These conclusions were also based on the framer's failure to include buildings on the list of products set forth in comment *d* of section 402A and on the availability of remedies against those responsible for defective construction on negligence and implied warranty theories. Moreover, the court reasoned that "if structures and their builders were to be held to strict liability the framers of the Restatement would not have included the

standard of care pertinent to builders, contractors and sellers of real property set forth in sections 353, 385 and comment *e* of section 389." *Lowrie*, 50 Ill. App. 3d 376, 385.

In *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465, the plaintiff was injured when electricity arced from the defendant's power wires to the antenna he was installing, passed through the tower on which he was working, and struck him. He argued that the electricity causing his injuries was a product within the meaning of section 402A, that the wires carrying the electricity were the packaging, and that the absence of insulation or the deteriorating condition of the insulation on the wires rendered the product defective. The supreme court first held that the defendant's power wires could not fall within the definition of "package" either as it was generally defined or as used within the context of strict liability. (*Genaust*, 62 Ill. 2d 456, 463-64.) The court went on to state:

> "Even if plaintiff's contention were accepted, the doctrine of strict liability would still not be applicable. The power wires were not sold to any consumer, but were owned and controlled by Illinois Power. The only 'product' that was in the process of being sold was the electricity itself, and plaintiff does not contend there was any defect in the electricity.
>
> ✻ ✻ ✻
>
> In the present case plaintiff's own averments [that the wires carried 'high voltage electricity' and that the electricity was being transmitted in 'bulk'] disclose that the electricity was not in the condition in which it was to be sold. Plaintiff does not dispute that electrical energy, transmitted at high voltage, must be changed by the use of various transformers and other electrical devices to a form which a consumer can use in his home or factory. It is obvious that the high-voltage electricity in question remained in the control of Illinois Power and was neither delivered nor sold to any consumer." (*Genaust*, 62 Ill. 2d 456, 464-65.)

The supreme court thus affirmed the dismissal of the plaintiff's strict liability count.

The *Genaust* decision was subsequently cited in *Immergluck v. Ridgeview House, Inc.* (1st Dist. 1977), 53 Ill. App. 3d 472, 368 N.E.2d 803, for the proposition that guidance for determining whether something is a product may be determined by whether the product is in the stream of commerce (*Immergluck*, 53 Ill. App. 3d 472, 474). In that case the court found that the sheltered care facility in issue had not been placed in the stream of commerce, and had not been mass produced so that the risk of injury could not be distributed. It was therefore held that a sheltered care facility was not a product within the meaning of section 402A.

(*Immergluck*, 53 Ill. App. 3d 472, 476.) It was further held that the sheltered care services provided by that facility were not products since the plaintiff merely alleged that the defendant had "produced and sold to the public, a product consisting of services* * *." *Immergluck*, 53 Ill. App. 3d 472, 473.

■■ Summarizing the definition of product within the meaning of section 402A as established by the foregoing cases, we find that a "product" with an unreasonably dangerous condition may subject those responsible for placing it in the stream of commerce to strict liability in tort may serve more than one purpose; may be unchanged from its natural state, viable, and not the result of a manufacturing process; must be of a fixed nature; and must be capable of being placed in the stream of commerce. Moreover, to satisfy the public policy reasons underlying the concept of strict liability in tort, we must also find that the "product" is something that may endanger human life and health; something whose intended use has been solicited and thought to be safe and suitable; and something that has reaped a profit for those placing it in the stream of commerce. Finally, we must consider the defendant's ability to distribute the risk of injury by passing the loss onto the public, and the injured party's difficulty in proving that the source of his injury was the defendant's negligence.

## A.

Plaintiffs contend that electricity has been held to be a product within the meaning of section 402A, and therefore, that X-radiation, a form of electricity, should also be held to be a product for the purpose of stating a cause of action based on strict liability in tort.

The doctrine of strict liability in tort as embodied in section 402A has been raised by several plaintiffs in an effort to recover for injury or death resulting from electricity escaping from power lines. (See *Genaust*, 62 Ill. 2d 456; *Cratsley v. Commonwealth Edison Co.* (1st Dist. 1976), 38 Ill. App. 3d 55, 347 N.E.2d 496; *Kemp v. Wisconsin Electric Power Co.* (1969), 44 Wisc. 2d 571, 172 N.W.2d 161; *Wood v. Public Service Co.* (1974), 114 N.H. 182, 317 A.2d 576; *Erwin v. Guadalupe Valley Electric Co-Op* (Tex. Civ. App. 1974), 505 S.W.2d 353; *Williams v. Detroit Edison Co.* (1975), 63 Mich. App. 559, 234 N.W.2d 702; and *Petroski v. Northern Indiana Public Service Co.* (1976), ___ Ind. App. ___, 354 N.E.2d 736.) Most of these decisions did not expressly consider whether electricity was or was not a product within the meaning of section 402A, but went on to find that the circumstances of the particular injuries or deaths did not satisfy the other elements of the strict liability doctrine either because the electricity was still under the control of the manufacturer and had not been released into the stream of commerce (*Genaust*, 62 Ill. 2d 456, 464-65; *Kemp*, 44 Wisc. 2d 571, 583; see also *Williams*, 63 Mich. App. 559, 568,

and *Petroski*, 354 N.E.2d 736, 747) or because the plaintiff had not alleged that there was any defect in the electricity itself (*Genaust*, 62 Ill. 2d 456, 464; *Erwin*, 505 S.W.2d 353, 355; *Cratsley*, 38 Ill. App. 3d 55, 58).

The two jurisdictions to expressly consider whether electricity is a product within the meaning of section 402A have reached opposite conclusions. In *Williams*, the court held that electricity supplied by the defendant power company was a service rather than a "good" (see *Williams*, 63 Mich. App. 559, 564), but nevertheless considered the applicability of the doctrine of strict liability in tort since it had previously extended implied warranties to the sale of electrical services (see *Buckeye Union Fire Insurance Co. v. Detroit Edison Co.* (1972), 38 Mich. App. 325, 329-30, 196 N.W.2d 316). On the other hand, the Indiana Appellate Court has expressly held electricity to be a "good" as defined by the Uniform Commercial Code (Ind. Ann. Stat. §19—2—105 (Burns 1964); *Helvey v. Wabash County REMC* (1972), 151 Ind. App. 176, 179, 278 N.E.2d 608, 610) and a "product" within the meaning of 402A (*Petroski v. Northern Indiana Public Service Co.* (1976), ___ Ind. App. ___, 354 N.E.2d 736, 747).

Our supreme court in *Genaust* merely stated:

> "Assuming, *arguendo*, that electricity is a 'product,' it does not logically follow that the wires are its 'packaging.' * * * The only 'product' that was in the process of being sold was the electricity itself, * * *." (*Genaust*, 62 Ill. 2d 456, 463-64.)

We do not, as the plaintiffs urge, construe this language as expressly holding that electricity constitutes a product in a cause of action grounded on strict products liability. Our research has revealed no other Illinois cases so holding.

In *Peoples Gas Light & Coke Co. v. Ames* (1934), 359 Ill. 152, 194 N.E. 260, several public utility companies, including the Commonwealth Edison Company and the Central Illinois Public Service Company which furnished electricity to the public, argued that they were not liable to pay the tax imposed upon persons engaged in the business of selling tangible personal property at retail by the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1933, ch. 120, par. 440 *et seq.*). Section 1 of that act defined a "sale at retail" as "any transfer of the ownership of, or title to, tangible property to the purchaser, for use or consumption and not for resale in any form as tangible personal property, for a valuable consideration." (Ill. Rev. Stat. 1933, ch. 120, par. 440.) Strictly construing the Retailers' Occupation Tax Act and the Public Utilities Act (Ill. Rev. Stat. 1933, ch. 111 2/3, par. 1 *et seq.*), the court found that the legislature regarded public utilities as engaged in rendering services rather than in selling, and, therefore, accepted the plaintiffs' argument that they were not engaged in the

business of selling tangible personal property within the meaning of the Retailers' Occupation Tax Act.

However, two years later, the supreme court again considered the nature of electricity without the context of its supply by a public utility and the confines of a statute requiring tangibility. In *People v. Menagas* (1937), 367 Ill. 330, 11 N.E.2d 403, the defendant was charged with larceny of 70,601 kilowatt hours of electricity under section 167 of the Criminal Code which provided that: "Larceny shall embrace every theft which deprives another of his money or other personal property." (Ill. Rev. Stat. 1935, ch. 38, par. 3807.) The defendant argued that electricity was not personal property, either tangible or intangible, and "that, as electrons are the only elements of electricity and electrical energy which are matter, and as none of the electrons were consumed * * *, there was nothing charged to have been stolen by [him] that could be made the subject of larceny." (*Menagas*, 367 Ill. 330, 332.) Quoting from *Woods v. People* (1906), 222 Ill. 293, 298-99, 78 N.E. 607, in which illuminating gas had been held to be the subject of larceny, the court rejected the defendant's argument stating:

> " 'There is nothing in the nature of gas used for illuminating purposes which renders it incapable of being feloniously taken and carried away. It is a valuable article of merchandise bought and sold like other personal property susceptible of being severed from a mass or larger quantity and of being transported from place to place.' That test is applicable to electrical energy, for it will be seen, * * *, that electrical energy may likewise be taken and carried away. It is a valuable commodity, bought and sold like other personal property. It may be transported from place to place. While it is intangible, it is no less personal property and is within the larceny statute." (*Menagas*, 367 Ill. 330, at 338.)

The court perfunctorily dismissed the holding of *Peoples Gas Light Co.* as "not inconsistent" (*Menagas*), and relied in part on *State v. Interstate Power Co.* (1929), 118 Neb. 756, 226 N.W. 427, which had rejected the defendant power company's argument that furnishing electricity was a service and had held that electricity was a commodity (*State*, at 771).

Whether a public utility company such as those in *Peoples Gas Light Co.* and *Genaust* should be regarded as selling a product or engaged in the business of providing a service is not the issue before this court. However, for the purpose of deciding whether X-radiation is a product within the meaning of section 402A, we note that electricity has been characterized as a "silent, deadly and instantaneous force" (*Merlo v. Public Service Co.* (1942), 381 Ill. 300, 314, 45 N.E.2d 665) comparable to the "operation of a firing range or the handling of explosives" (*Mullen v.*

*Chicago Transit Authority* (1st Dist. 1961), 33 Ill. App. 2d 103, 113, 178 N.E.2d 670). Thus, there can be little doubt that it endangers human life and health. Moreover, we do not believe that it can be successfully argued that its injurious nature is not at all times fixed as required by *Whitmer*. Although intangible, electricity is capable of being transported from place to place (*Menagas*), and, therefore, is capable of being placed in the stream of commerce. Electricity may be bought and sold (*Menagas*); therefore, its sale reaps a profit for those placing it in the stream of commerce so that the burden of the cost of accidental injuries therefrom is justifiably placed on them. Although electricity may also exist in a natural state (lightning), this factor does not prevent a finding that it is a product within the meaning of section 402A. (See *Cunningham*.) Finally, considered in the context of its supply by power companies, we note their ability to distribute the risk of injury by passing the loss onto the public in the form of increased rates, and the disparity in the parties' positions and bargaining power for its supply.

Under these circumstances, we are of the opinion that electricity falls within the definition of a product within the meaning of section 402A as thus far established by our courts.

## B.

Relying primarily on *Neuberg v. Michael Reese Hospital & Medical Center* (N.D. Ill. 1978), No. 78 C 3844,[4] the defendant contends that it is not engaged in the sale of a product, but rather is engaged in rendering a professional medical service. In *Neuberg*, the district court dismissed a strict liability count containing allegations similar to the instant case. After noting our supreme court's holding in *Cunningham*, the court stated:

> "Unlike blood, x-ray treatments are not tangible articles distributed for human consumption. X-ray radiation was used in this case as part of a treatment program, and was incidental to the rendering of a service by a doctor to a patient. The doctrine of products liability is thus inapplicable."

This court is not bound by the *Neuberg* court's decision. See *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 118, 368 N.E.2d 891.

■■■ A Roentgen ray, or X-ray, is "any of the electromagnetic radiations having the nature of visible light * * * produced by bombarding a metallic target with fast electrons in [a] vacuum so that the spectrum of the radiation emitted [X-radiation] consists of lines characteristic of the target material and that X has the properties of ionizing a gas upon passage through it, of penetrating through various thicknesses of all solids, of producing secondary radiations by impinging on material bodies, * * *."

---

[4] This opinion was not published but was supplied to this court in the defendant's excerpts.

(Webster's Third New International Dictionary 2645 (1971).) X-rays are absorbed into the body (O'Toole, *Radiation, Causation and Compensation*, 54 Geo. L. J. 751, 756 (1966)), and are capable of ionizing tissue through the liberation of photo-electrons (American Illustrated Medical Dictionary 1229 (1950)). The defendant conceded at oral argument before this court that an X-ray, or X-radiation, is derived from and composed of electricity. From the foregoing we so find. Thus, what we have said with regard to electricity applies equally to X-radiation. Just as electricity has been held to be personal property despite its intangible nature (*Menagas*), and a product within the meaning of section 402A, (*Petroski*), unlike the *Neuberg* court, we have no difficulty finding X-radiation to be a product within the meaning of section 402A despite its intangible nature. In reaching this conclusion, we note that the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 *et seq.* (1976)) considers poultry and other foods to be adulterated if intentionally subjected to radiation (see 21 U.S.C. 453(g)(7), and 342(a)(7) (1976)), and that the word "adulteration" within the meaning of that act has been found to mean to corrupt, debase, or make impure by an admixture of a foreign or base *substance* (*United States v. St. Louis Coffee & Spice Mills* (E. D. Mo. 1909), 189 F. 191, 193). Moreover, although the issue of whether the X-radiation supplied the plaintiffs by the defendant was the proximate cause of their injuries is a question of fact for a jury to decide, we note that a program for the development of standards to control the emission of radiation from such products as X-ray machines and for research into the effects of such radiation has been established. See The Radiation Control for Health and Safety Act of 1968, 42 U.S.C. 263(b) *et seq.* (1976); Legislative History, U.S. Dept. of Health, Education and Welfare, DHEW Pub. (FDA), 75-8033 (May 1975).

Just as our supreme court in *Suvada* queried whether there was any reason for imposing strict liability in cases involving food products and negligence in cases involving other products, we must determine whether there is any reason to apply the doctrine of strict liability to cases involving such products as whole blood (see *Cunningham*), a concrete nail (see *Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170), and a vast array of other products, but to require proof of negligence in cases involving X-radiation. Based on the foregoing, we find no such reason, and, therefore, hold that X-radiation is a product within the meaning of section 402A.

■ Secondly, we do not agree with the *Neuberg* court in its refusal to extend the doctrine of products liability to the defendant's supply of X-radiation because it "was incidental to the rendering of a service." Strict liability is no longer limited to sellers as provided in section 402A and as applied in *Suvada*, but rather has been extended to include lessors (see

*Galluccio v. Hertz Corp.* (5th Dist. 1971), 1 Ill. App. 3d 272, 277-79, 274 N.E.2d 178), former lessors (see *Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, 17, 383 N.E.2d 951), and all those playing an integral role in placing a defective product in the stream of commerce (see *Crowe*, 74 Ill. 2d 10, 17). As noted in *Immergluck*, Illinois has not extended the doctrine of strict liability to include purely services. (See, *e.g., Laukkanen v. Jewel Tea Co., Inc.* (4th Dist. 1966), 78 Ill. App. 2d 153, 162, 222 N.E.2d 584 (designing engineer drawing plans and specifications for the construction of a building); *Eiler v. Kenneth Jamison & Sons, Inc.* (5th Dist. 1972), 8 Ill. App. 3d 889, 890, 290 N.E.2d 322 (brick contractor whose rebuilding of a furnace was allegedly done in an unreasonably dangerous manner).) However, the doctrine of strict liability has been extended to include those supplying a product incident to their regular course of business. (See *Bainter v. Lamoine LP Gas Co.* (3d Dist. 1974), 24 Ill. App. 3d 913, 916, 321 N.E.2d 744.) In this regard, we are of the opinion that our supreme court's decision in *Cunningham* is dispositive of the defendant's contention that it is in the business of rendering a service rather than selling a product. In *Cunningham*, the court stated:

> "Further, that providing blood for patients is not a hospital's principal function clearly cannot determine, as maintained by defendant, whether it is engaged in the business of selling a product (*i.e.*, blood) for purposes of the imposition of strict liability. Thus, as set forth in the Restatement: '*f. Business of Selling.* * * * It is not necessary that the seller be engaged solely in the business of selling such products. * * *.' * * * Although it may be conceded that a blood bank's *principal function* is to stockpile blood for dispensation to various institutions, whereas a hospital ordinarily provides blood for transfusion purposes only ancillarily and as a part of its total services, both entities are clearly within the distribution chain of the product involved." *Cunningham*, at 451-52.

Nor are we dissuaded from this view by the fact that the legislature subsequently provided that the furnishing of blood, blood products, and other human tissues is a service for purposes of liability in tort or contract. (See Ill. Rev. Stat. 1977, ch. 91, par. 182.) This legislation is limited in scope to the supply of the products specifically set forth therein (*i.e.*, blood, blood products, and other human tissues), and the public policy declaration therein is addressed only to "such scientific procedures." (See Ill. Rev. Stat. 1977, ch. 91, par. 181.) The defendant cites us to no authority and we have found none construing this legislation as providing hospital immunity from suits based on strict liability theories involving other products such as X-radiation. That there is no such immunity is supported by the following statement of the *Cunningham* court:

"We have heretofore abolished charitable immunity insofar as that doctrine insulated not-for-profit hospitals from the consequences of their negligence [citations], and we see no good reason for engrafting, judicially, an exception in their favor onto the strict tort liability theory * * *." *Cunningham*, at 452.

For all of the foregoing reasons, we hold that the supply of X-radiation for absorption into a patient for treatment purposes by a hospital, for which a charge is made, places such hospital in the business of introducing such X-radiation in the stream of commerce. However, we hasten to add that our holding does not make such a hospital an absolute insurer. The plaintiffs must prove in the trial of this matter that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time it left the manufacturer's control. See *Suvada*, at 623.

## C.

■■ The defendant next contends that the plaintiffs failed to allege that the X-radiation supplied was defective, and, therefore, that this case falls within the holding of *Evans v. Northern Illinois Blood Bank, Inc.* (2d Dist. 1973), 13 Ill. App. 3d 19, 298 N.E.2d 732. Suffice it to say that under strict liability it is well recognized that a product may become defective or unreasonably dangerous if it is not accompanied by an adequate warning of the danger attending its use. (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 550, 356 N.E.2d 779; *Woodill v. Parke Davis & Co.* (1st Dist. 1978), 58 Ill. App. 3d 349, 351, 374 N.E.2d 683; Restatement (Second) of Torts, Section 402A, Comments j. and h. (1965).) Plaintiffs allege that the defendant's failure to warn them of the alleged carcinogenic properties of X-radiation rendered such products unreasonably dangerous. Therefore, the defendant's argument is without merit.

The defendant finally contends that each of the plaintiffs' complaints fails to state a cause of action due to the absence of an allegation that the defendant knew or should have known of the alleged dangerous propensities of X-radiation at the time it was supplied to them.

■■■ It has long been recognized that a duty to warn under strict liability in tort exists only if the defendant knew or should have known of the danger. (*Peterson v. B/W Controls, Inc.* (3d Dist. 1977), 50 Ill. App. 3d 1026, 1029, 366 N.E.2d 144; *Woodill*, at 353; Restatement (Second) of Torts §402A, Comments j and h (1965).) However, it was not until January 1978 that it was held that a complaint fails to state a cause of action for failure to warn in the absence of an allegation that the defendant knew or should have known of the danger. (See *Woodill*, at 354.) Moreover, the defendant's motions to dismiss did not urge this insufficiency as a ground for dismissal. A motion to dismiss a complaint

946

pursuant to section 45 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 45) must specifically point out why a pleading is thought to be insufficient so as to allow the party against whom the motion is directed an opportunity to cure by amendment the specified objection (*Lee v. Conroy* (3d Dist. 1973), 13 Ill. App. 3d 694, 696, 300 N.E.2d 505). The defendant on appeal may not raise new grounds in support of his motion to dismiss to deny the plaintiffs an opportunity to cure this defect by amendment. See *Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548, 556, 309 N.E.2d 550; *Anderson v. Olsen* (1st Dist. 1938), 293 Ill. App. 637, 13 N.E.2d 210 (abstract).

Having found that the plaintiffs' complaints state causes of action predicated on strict tort liability theories, we reverse the orders of the trial court dismissing those counts and remand for such further proceedings as may be appropriate.

Reversed and remanded.

STAMOS, P. J., and HARTMAN, J., concur.