970 P.2d 972

Doris C.C. LEONG, Individually and as Next Friend of Kamalii Leong, Minor, Plaintiff–Appellee,

v.

SEARS ROEBUCK AND COMPANY, and Doe Defendants 1–10, Defendants–Appellants.

Sears Roebuck and Company, Defendant and Third–Party

Plaintiff–Appellee,

v.

Westinghouse Electric Corporation, a Pennsylvania corporation, and Schindler Elevator Companies, a Delaware corporation, John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Joint Ventures 1–10; and Doe Governmental Entities 1–10, inclusive, Third–Party Defendants–Appellants.

No. 20865

Supreme Court of Hawai'i.

Dec. 14, 1998.

Paul V. Smith and David C.Schutter (of David C.Schutter and Associates) on the briefs, for the plaintiff-appellee, Doris C.C. Leong.

John R. Lacy and Normand R. Lezy (of Goodsill Anderson Quinn & Stifel) on the briefs, for the defendant/third-party plaintiff-appellant, Sears Roebuck and Co.

Lisa B. Ginoza and Stacey M. Robinson (of McCorriston Miho Miller Mukai) on the briefs, for the third-party defendants-appellants, Schindler Elevator Corp. and Westinghouse Electric Corp.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, J.

LEVINSON, Justice.

The plaintiff-appellee Doris C.C. Leong (Leong), individually and on behalf of Kamalii Leong (Kamalii), filed a complaint in the first circuit court against the defendant/thirdparty plaintiff-appellant Sears Roebuck and Company (Sears), alleging, *inter alia*, products liability, negligence, the infliction of emotional distress, and punitive damages, arising out of an accident in which Kamalii was injured by an escalator at the Sears Department Store at Ala Moana Center, in the City and County of Honolulu. Sears removed the action to the United States District Court for the District of Hawai'i (federal district court) and subsequently filed a third-party complaint against the third-party defendants-appellants Westinghouse Electric Corporation (Westinghouse) and Schindler Elevator Corporation (Schindler), seeking indemnification and/or contribution from Westinghouse and/or Schindler in the event that Leong was found to be entitled to recovery. Westinghouse and Schindler answered and counterclaimed. Leong filed a cross-claim against Westinghouse and Schindler. Westinghouse and Schindler answered and counterclaimed.

Westinghouse and Schindler then filed a motion for summary judgment as to all of the claims alleged by Leong in her complaint and cross-claim. Sears joined in the motion. Following the hearing on Westinghouse and Schindler's motion for summary judgment, the federal district court, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 13 (1995), certified the question "[w]hether an escalator in a commercial building accessible to the general public constitutes a product for purposes of a claim for strict products liability under Hawaii law?" We accepted certification and now answer the question with a qualified "yes."

## I. *BACKGROUND*

The underlying facts are not disputed. On or about January 3, 1996, Leong's preschool daughter, Kamalii, was injured when her hand became caught on the handrail return component of the escalator, which descends from the mall level to the ground level of the Sears Department Store. The escalator was manufactured and installed in 1959. In her complaint against Sears, filed on April 9, 1996, and likewise in her counterclaim against Westinghouse and Schindler, filed on January 31, 1997, Leong alleged, *inter alia*, that Sears, Westinghouse, and Schindler were liable, pursuant to a theory of products liability, for the damages resulting from the accident.

On May 5, 1997, Westinghouse and Schindler, the alleged manufacturer and distributor of the escalator, filed a motion for summary judgment as to all of Leong's claims alleged in her complaint and cross-claim. On May 21, 1997, Sears joined in the motion. The hearing on the motion generated the question that is presently before us.

## II. *DISCUSSION*

Sears, Westinghouse, and Schindler argue that such decisions as *Bidar v. Amfac, Inc.*, 66 Haw. 547, 669 P.2d 154 (1983), *Armstrong v. Cione*, 69 Haw. 176, 738 P.2d 79 (1987), *Messier v. Association of Apartment Owners of Mt. Terrace*, 6 Haw.App. 525, 735 P.2d 939 (1987), and *Kennedy v. Vacation Internationale, Ltd.*, 841 F.Supp. 986 (D.Haw.1994), compel the conclusion that the escalator at issue in the present case, being an item or fixture that is an integral part of a building, is not a "product" for purposes of Hawai'i strict products liability law. This court, however, has construed the term "product" on a case-by-case basis, taking into consideration the policies underlying the doctrine of strict products liability. Accordingly, it is useful to retrace the development of strict products liability law in Hawai'i in order to answer the federal district court's certified question.

In *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 470 P.2d 240 (1970), this court first integrated strict products liability into Hawai'i law, observing that

strict liability in tort is a sound legal basis for recovery in products liability cases. The leading arguments for the adoption of a rule of strict products liability have been that the public interest in human life and safety requires the maximum possible protection that the law can muster against dangerous defects in products; that by placing the goods on the market the maker and those in the chain of distribution represent to the public that the products are suitable and safe for use; and that the burden of accidental injuries caused by defective chattels should be placed upon those in the chain of distribution as a cost of doing business and as an incentive to guard against such defects.

Therefore, we adopt the rule that one who sells or leases a defective product which is dangerous to the user or consumer or to his property is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, or to his property, if (a) the seller or lessor is engaged in the business of selling or leasing such product, and (b) the product is expected to and does reach the user or consumer without substantial change in its condition after it is sold or leased. This is essentially the rule adopted in the *Second Restatement of Torts*, Section 402A.

*Id.* at 74–75, 470 P.2d at 243 (footnotes omitted).

The *Stewart* court did not undertake to describe with precision the construct of a "product" for purposes of strict products lia-

bility. Subsequently, however, in *Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 654 P.2d 343 (1982), the exercise was undertaken:

> [T]he restatement and its comments leave undefined the term "product." Comment d[,] which by no means is an exhaustive list[,] provides various examples of products where the doctrine would apply. Comment d states:
>
>> The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus[,] the rule stated applied to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair and an insecticide. It applies also to products which, if they are defective, may be expected to do and cause only "physical harm" in the form of damage to the user's land or chattels, as in the case of animal food or a[n] herbicide.
>
> One court has held that failure to be included in the list of products set forth in comment d of Section 402A may be sufficient justification for the non-application of strict liability. *Lowrie v. City of Evanston*, 50 Ill.App.3d 376, 8 Ill.Dec. 537, 365 N.E.2d 923 (1977).
>
> Other courts in trying to define whether something is a product under Section 402A have looked to the policy considerations underlying the strict liability doctrine. *Walker v. Shell Chemical Inc.*, 101 Ill. App.3d 880, 57 Ill.Dec. 263, 428 N.E.2d 943 (1981); *Moorman Manufacturing Co. v. Nat'l Tank Co.*, 92 Ill.App.3d 136, 47 Ill. Dec. 186, 428 [414] N.E.2d 1302 (1980); *Anderson v. Farmers Hybrid Co., Inc.*, 87 Ill.App.3d 493, 42 Ill.Dec. 485, 408 N.E.2d 1194 (1980); *Heller v. Cadral Corp.*, 84 Ill.App.3d 677, 40 Ill.Dec. 387, 406 N.E.2d 88 (1980); *Dubin v. Michael Reese Hospital & Medical Ctr.*, 74 Ill.App.3d 932, 30 Ill.Dec. 552, 393 N.E.2d 588 (1980); *Immergluck v. Ridgeview House, Inc.*, 53 Ill. App.3d 472, 11 Ill.Dec. 252, 368 N.E.2d 803 (1977); *Lowrie v. City of Evanston, supra; Housman v. C.A. Dawson & Co.*, 106 Ill. App.2d 225, 245 N.E.2d 886 (1969); *see generally, Note* "What is not a Product Within the Meaning of Section 402A," 57 Marq. L.Rev. 625 (1974). The court in *Lowrie* stated:

>> [W]e are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than ... to focus on the dictionary definition of the word.

> 50 Ill.App.3d at 383, 8 Ill.Dec. at 542, 365 N.E.2d at 928.
>
> In further refining the definition of "product" expressed in *Lowrie*, the court in *Dubin v. Michael Reese Hospital & Medical Ctr., supra*, at 939, 30 Ill.Dec. at [557], 393 N.E.2d at 593 expressed the following:

>> Summarizing the definition of a product within the meaning of 402A as established by the foregoing cases, we find that a "product" with an unreasonably dangerous condition may subject those responsible for placing it in the stream of commerce to strict liability in tort[;] may serve more than one purpose; may be unchanged from its natural state, viable, and not the result of a manufacturing process; must be of a fixed nature; and must be capable of being placed in the stream of commerce. Moreover, to satisfy the public policy reasons underlying the concept of strict liability in tort, we must also find that the "product" is something that may endanger human life and health; something whose intended use has been solicited and thought to be safe and suitable; and something that has reaped a profit for those placing it in the stream of commerce. Finally, we must consider the defendant's ability to distribute the risk of injury by passing the loss onto the public, and the injured party's difficulty in proving that the source of his injury was the defendant's negligence.

Another source of guidance can be found in the Model Uniform Product Liability Act published by the United States Department of Commerce. 44 Fed.Reg. 62714 (1979). Although this act does not have the force of law, its analysis can help shed light in our inquiry. Section 102(C) of the Act defines product as follows at 62717:

"Product" means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce. Human tissue and organs, including human blood and its components, are excluded from this term.

The analysis to this section provides an understanding of the act and it states in pertinent part at 62719:

"Product" means property which, as a component part or an assembled whole, is movable, and possesses intrinsic value. Therefore, included are all goods, wares, merchandise, and their components, as well as articles and commodities capable of delivery for introduction into trade or commerce.

\* \* \* \* \*

In a specific case, the particular product with which this Act is concerned is the "relevant product" which actually gave rise to the product liability claim. The "relevant product" may be the product as a whole or the particular component part or parts which gave rise to the product liability claim.

In order to cope with technological advances, we decline to establish a firm definition of "product" to which the doctrine of strict liability applies. Rather, a product should be determined on a case-by-case basis with the determination guided by the applicable case law, the public policy considerations underlying strict liability, the comments to the Restatement (Second) of Torts, and the Model Uniform Products Liability Act.

*Id.* at 453–55, 654 P.2d at 347–49 (footnotes omitted).

Guided by the principles enumerated above, the *Kaneko* court determined that a "prefabricated mill building" was a product to which the doctrine of strict products liability applied. The court reasoned:

The Restatement has not taken a position on whether Section 402A applied to the seller of a component part of a product to be assembled. *See* Caveat No. 3, Restatement (Second) of Torts, § 402A. However, comment q does make clear that if the component part is merely incorporated into something larger and there is no change in the component part itself, strict liability is applicable. Comment q, Restatement (Second) of Torts, § 402A.

A line of authority has held that a building is not a product within the meaning of Section 402A, Restatement (Second) of Torts. *See Heller v. Cadral Corp., supra; Immergluck v. Ridgeview House, Inc., supra; Lowrie v. City of Evanston, supra.*

The Illinois appellate court in *Lowrie* held that an open-air parking garage was not a product to which the doctrine of strict liability would apply. In spite of the public policy reasons underlying the doctrine, the court concluded that adequate remedies existed wherein it was unnecessary to further extend the doctrine. Further support for this consideration was found by examining the intent of the framers of the Restatement. The *Lowrie* court observed:

Moreover, we believe that the framers did not originally contemplate a structure such as a building to be a product. This is evident (a) from the fact that although comment d lists a number of products within the purview of § 402A, it does not include buildings; and (b) because the liability of builders is described and articulated in other sections of the Restatement, it appears to us that if structures and their builders were to be held to strict liability[,] the framers of the Restatement would not have included the standard of care pertinent to builders, contractors, and sellers of real property set forth in §§ 353, 385 and comment e of 389.

50 Ill.App.3d at 384–85, 8 Ill.Dec. at [543], 365 N.E.2d at 929. The court also con-

cluded that the parking spaces which were part of the structure itself were not products contemplated by Section 402A.

Relying on *Lowrie*, the Illinois courts also held in *Heller v. Cadral Corp., supra*, that a condominium, viewed in whole or in its component parts, was not a product as contemplated in strict products liability. Accordingly, the court upheld the dismissal of that action.

Similarly, in *Immergluck v. Ridgeview House, Inc., supra*, the court determined that a shelter-care facility was not a product within the meaning of Section 402A and held that an action under strict products liability was not maintainable.

Another line of cases presenting the alternative viewpoint is exemplified by *Lantis v. Astec Ind., Inc.*, 648 F.2d 1118 (7th Cir.1982). In *Lantis*, the court, rejecting the argument that Section 402A does not apply to "assembly-type situations," held that a seller-manufacturer may be found strictly liable for injuries caused by a defective component part of an unassembled product. Astec Industries[,] who was engaged in the business of designing, manufacturing and selling asphalt plants[,] entered into a contract to manufacture an asphalt mixing plant for E & B Paving Co. After fabrication, the plant, in its component parts, was shipped to the building site. While the plant was being erected, Edgar Lantis fell through an opening in the center of a service platform[,] which resulted in his death. The Seventh Circuit concluded that because the component parts arrived without substantial change and its use was foreseeable and that no warnings were given with respect to the opening, plaintiff was entitled to go to the jury on the products liability theory and that the trial court erred in directing a verdict for defendant Astec on products liability.

Other courts have extended the doctrine of products liability to buildings or parts of buildings that were mass produced and contained a defective product. *See Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965); *Kriegler v. Eichler*

*Homes, Inc.*, 269 Cal.App.2d 224, 74 Cal. Rptr. 749 (1969).

Upon consideration of these differing views, it is our opinion that a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part. We agree with the conclusions of the *Lantis* court that strict liability applies to "assembly-type situations."

In addition, the public policy reasons expressed in *Stewart v. Budget Rent-A-Car Corp., supra*, would be reaffirmed in applying the doctrine here. Maximum protection to injured persons from defects in products would be provided. Furthermore, the manufacturer-seller, Mutual Welding, is best able to distribute the risk of injury for distributing defective chattel as a cost of doing business. And finally, imposing the doctrine in this instance would serve as an incentive on the manufacturer to guard against such defects happening in the future.

Moreover, Comment d, Restatement (Second) of Torts cannot be read as being an exclusive list of products to which strict liability applies. As we acknowledged earlier, the enunciated list is not an exhaustive list of examples of products. We believe that given the technological advances being made, flexibility to respond to future developments is necessary.

*Id.* at 456–58, 654 P.2d at 349–50.

Notwithstanding the *Kaneko* analysis, this court subsequently held in *Bidar* that "a portion of a leased or rented premises that prove[d] defective" was not a product. 66 Haw. at 556–57, 669 P.2d at 161 (brackets, ellipsis points, and internal quotation signals omitted). In *Bidar*, a hotel guest was injured when the towel bar that she grasped in order to pull herself to an upright position after using the toilet tore loose from the wall, causing her to lose her balance, fall, and become wedged between the toilet and the bathtub, thereby fracturing her hip and wrist. *Id.* at 549, 669 P.2d at 157. In her suit for damages, Bidar alleged, *inter alia*, that the hotel owner and operator was "strictly liable to [her] for the damages sus-

tained." *Id.* (internal quotation signals omitted). In addressing Bidar's claim, this court initially observe[d that] the plaintiff has vacillated in alleging precisely what product and defect form the basis of the cause of action.

... At one point before the circuit court, however, when [the defendant] argued [that] a hotel room has yet to be deemed a "product" by a court applying the rule of strict liability in tort, the plaintiff denied ever suggesting the hotel room was the "product" in question and asserted the towel rack was the defective product. But before this court, counsel seems to beat a retreat from the earlier stance; his thesis now is that "[i]f a portion of the leased or rented premises should prove defective, product liability rules of law apply."

Though mindful "that the public interest in human life and safety requires the maximum possible protection that the law can muster against dangerous defects in products," *Stewart v. Budget Rent–A–Car Corp.,* 52 Haw. 71, 74, 470 P.2d 240, 243 (1970), we cannot agree that our rule of strict liability should be applied here. For it is still a rule of "product" liability, and we are not certain to what product or defect the plaintiff ascribes her injuries.

. . . .

Recently, in *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982), we were called upon to decide whether a construction worker injured in a fall occurring during the erection of a building could invoke the rule of strict liability in a suit against the manufacturer of the structure's prefabricated components. A defective weld in a steel girt fabricated by the defendant was an apparent factor in causing plaintiff to fall. . . . [W]e concluded [that] "a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part." *Id.*

Yet, an identified component of a prefabricated building can hardly be likened to "a portion of the leased or rented premises ... [that] prove[s] defective." We perceive no good reason here to lend a more expansive meaning to "product" than we did in *Kaneko* . . . .

*Id.* at 555–57, 669 P.2d at 160–61 (footnote omitted).

This court expanded its "product" analysis in *Armstrong,* in which it held that a renter who had been injured when a glass shower door had broken, thereby lacerating his arm, could not recover against his landlord on a strict products liability basis because a

shower door was not a "product" for purposes of a strict products liability cause of action.

... *Kaneko* concluded that because a prefabricated building is assembled from component parts without substantial change or appropriate warnings, and since the manufacturer is best able to distribute the loss resulting from the harm incurred while assembling the structure, it is a "product" for purposes of strict products liability. *See id.* at 457–58, 654 P.2d at 350 (adopting[,] in part[,] the reasoning of *Lantis v. Astec Industries, Inc.,* 648 F.2d 1118 (7th Cir.1981)).

However, more recently, we refused to hold a "portion of leased premises" to be a product for purposes of strict products liability. *Bidar v. Amfac, Inc.,* 66 Haw. 547, 556–57, 669 P.2d 154, 161 (1983). In *Bidar,* plaintiff was injured when a towel bar in a hotel room's bathroom tore loose from the wall as she attempted to use it to pull herself up. We construed the previous ruling in *Kaneko* to be limited to "a prefabricated building that must be assembled," and perceived "no good reason here to lend a more expansive meaning to 'product' than we did in *Kaneko.*" *Id.*

Similarly, the Intermediate Court of Appeals has construed this portion of *Kaneko* to prevent application of strict products liability to a metal panel torn loose during a rainstorm striking plaintiff while working on the roof of a building. *Messier v. Ass'n of Apartment Owners of Mt. Terrace,* 6 Haw.App. [525,] 735 P.2d 939 (1987). Looking to underlying policy considerations, the court determined that "[w]ithholding the rule will not measurably depreciate [plaintiff's] chances of obtaining compensation for his injuries," and "[h]e

does not face the kind of difficulty in proving [defendants'] negligence . . . as is faced by plaintiffs in other cases where the doctrine of strict product liability has been applied. *Messier,* 6 Haw.App. at [535,] 735 P.2d at 947–48.

The same considerations weigh against application of strict products liability here. The problems of proof that led to our adoption of strict products liability are not present. *Cf. Stewart v. Budget Rent–A–Car Corp.,* 52 Haw. at 75, 470 P.2d at 243[;] *American Broadcasting v. Kenai Air of Hawaii,* 67 Haw. 219, 227, 686 P.2d 1, 6 (1984); *Beerman v. Toro Manufacturing Corp.,* 1 Haw.App. 111, 115, 615 P.2d 749, 753 (1980), and traditional remedies for landlord's failure to adequately equip or maintain the premises still apply. *See Livingston v. Begay,* 98 N.M. 712, 717, 652 P.2d 734, 739 (1982). Further, unlike other sellers of consumer products, the landlord owning used property cannot adjust the costs of protecting the consumer up the chain of distribution. "He may only do it, at best, *down* the chain of 'distribution,' namely by charging more to his tenants." *Becker v. IRM Corp.,* 38 Cal.3d 454, 486, 213 Cal.Rptr. 213, 234, 698 P.2d 116, 137 (Lucas, J., dissenting in part) (1985) (emphasis in original). The same economic incentives for creating safer products through an enduring commercial relationship between the manufacturer and its distributors are not present in the case of the residential landlord. *See Livingston v. Begay,* 98 N.M. at 716, 652 P.2d at 738; *Dwyer v. Skyline Apartments, Inc.,* 123 N.J.Super. 48, 55, 301 A.2d 463, 467, *aff'g obiter dictum,* 63 N.J. 577, 311 A.2d 1 (1973) (per curiam).

Such a landlord is not engaged in mass production whereby he places his product—the apartment—in a stream of commerce exposing it to a large number of consumers. He has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition so as to be saddled with responsibility for a defect regardless of negligence.

An apartment involves several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes. It is a commodity wholly unlike a product which is expected to leave the manufacturer's hands in a safe condition with an implied representation upon which the consumer justifiably relies.

The tenant may expect that at the time of the letting there are no hidden dangerous defects known to the landlord and of which the tenant has not been warned. But he does not expect that all will be perfect in his apartment for all the years of his occupancy with the result that his landlord will be strictly liable for all consequences of any deficiency regardless of fault. He expects only that in the event anything goes wrong with the accommodations or the equipment therein, the landlord will repair it when he knows or should know of its existence; and that if injury results liability will attach.

*Dwyer,* 123 N.J.Super. at 55, 301 A.2d at 467.

69 Haw. at 183–85, 738 P.2d at 83–85 (footnote omitted).

As the federal district court noted in *Kennedy,* the common thread binding the *Bidar /Messier /Armstrong* line of cases was the "appl[ication of] the doctrine of strict product liability to *landlord-tenant* scenarios." (Emphasis added.) Under the circumstances of those cases, the allegedly defective item was not the defendant landlord's "product" because the defendant landlord had not manufactured or commercially distributed the item, but, rather, had utilized the item as an element of the residential accommodations they had offered for lease. Nonetheless, it is intuitively obvious to us that the towel bar at issue in *Bidar,* the metal roof panel at issue in *Messier,* and the glass shower enclosure at issue in *Armstrong* were "products" vis-a-vis the companies that manufactured and marketed them commercially. This distinction is the key to our analysis in the present matter.

Sears's position is analogous to that of the landlords in *Bidar, Messier,* and *Armstrong.* Because Sears did not manufacture or commercially distribute the escalator that allegedly caused Kamalii's injuries, the escalator cannot be Sears's "product." As in the case of the landlords, none of the public policy rationales justifying the doctrine of strict products liability would be served by concluding otherwise. Like the landlords, Sears cannot adjust the costs of protecting the consumer up the chain of distribution. Inasmuch as Sears did not produce the escalator, it is unable to protect against defects by means of the exercise of greater care during manufacture and assembly. Moreover, Sears, and the numerous other businesses that utilize escalators in their buildings, cannot be presumed to have the expertise necessary to know of and correct defects in their escalators so as to justify imposing responsibility for dangerous conditions regardless of negligence. *See Armstrong,* 69 Haw. at 185, 738 P.2d at 84. Thus, Sears cannot be liable in strict products liability with respect to the escalator.

However, Westinghouse and Schindler are not similarly situated. Analogously to the manufacturer of the prefabricated building in *Kaneko,* Westinghouse and Schindler have allegedly created a component part that has "merely [been] incorporated into something larger [without] change in the component part itself[;] [accordingly,] strict liability is applicable." *See Kaneko,* 65 Haw. at 456, 654 P.2d at 349. On this record, the public policy considerations articulated in *Stewart* and its progeny would be furthered by applying the doctrine to Westinghouse and Schindler. Such an application affords maximum protection to persons injured by defective products. Westinghouse and Schindler, the alleged commercial manufacturer and distributor, are positioned most appropriately to bear the burden of shouldering the risk of accidental injuries caused by defective escalators as a cost of doing business. And, finally, applying the doctrine of strict products liability to Westinghouse and Schindler in this instance creates "an incentive to guard against ... defects in the future." *See Stewart,* 52 Haw. at 75, 470 P.2d at 243 (footnote omitted).

## III. *CONCLUSION*

For the reasons discussed above, we hold that the escalator at issue in the present matter is *not* a "product" for purposes of Leong's claim against Sears, but that the escalator *is* a "product" for purposes of Leong's claims against Westinghouse and Schindler.