715 F.2d 166
 14 Fed. R. Evid. Serv. 363
 Jerry Loren JAMES, et al., Plaintiffs,
Rocky Mountain Helicopters, Inc., a corporation, Plaintiff-Appellant,
v.
BELL HELICOPTER COMPANY, et al., Defendants,
Bell Helicopter Company, a division of Textron, Inc., a
corporation, and Spring Division of Borg-Warner
Corp., a corporation, Defendants-Appellees.
 No. 82-1019.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 19, 1983.
 
 Lawrence O. de Coster, Drew E. Pomerance, Ralph S. LaMontagne, Jr., Los Angeles, Cal., for plaintiff-appellant.
 Brown, Herman, Scott, Dean & Miles, George Grant Liser, III, Beale Dean Stephen C. Howell, Fort Worth, Tex., for Bell Helicopter.
 Thompson, Knight, Simmons & Bullion, John H. Martin, Dallas, Tex., for Avco Corp.
 J. Carlisle De Hay, Jr., Kevin J. Cook, John T. Sears, Dallas, Tex., for Borg-Warner Co.
 Appeal from the United States District Court for the Northern District of Texas.
 Before REAVLEY and JOHNSON, Circuit Judges, and WYZANSKI*, District Judge.
 REAVLEY, Circuit Judge:
 
 
 1
 Appellant Rocky Mountain Helicopter Co. filed this suit against appellees Bell Helicopter Co. and Borg-Warner Corp. for damages arising from the crash of one of appellant's helicopters. Rocky Mountain asserted products liability and negligent manufacture, design, and testing claims against Bell and Borg-Warner. The district court dismissed the products liability claims prior to trial, and only the negligence claims were tried to a jury. The jury returned a verdict for Bell and Borg-Warner, and Rocky Mountain appeals.
 
 
 2
 Rocky Mountain's principal complaint is that the district court erred in dismissing its products liability claims. Rocky Mountain also asserts that the district court erred in excluding certain post-accident reports, arguing that they were not remedial measures.[1] We affirm as to Bell, but reverse as to Borg-Warner.
 
 FACTS
 
 3
 Rocky Mountain, a Utah corporation, is engaged in providing a variety of helicopter services throughout the western and northern portions of the United States. Rocky Mountain purchased from Bell, a Delaware corporation with its principal place of business in Texas, its Model 214B-1 helicopter, which contained a clutch manufactured by Borg-Warner with its principal place of business in Illinois. Rocky Mountain used this helicopter in logging operations in Salmon, Idaho, when the helicopter experienced a mysterious drop in rotor speed, causing it to crash.
 
 
 4
 Rocky Mountain first filed suit in state court in California, which was then removed to federal district court. Upon Bell's motion the case was transferred to Texas, where it was subsequently tried. Rocky Mountain's theory at trial was that while attempting to lift three logs, the clutch "rolled over," causing the engine to disconnect from the rotor blades and the helicopter to crash. Rocky Mountain presented evidence that the clutch was inadequately tested and in an unserviceable condition.
 
 
 5
 Bell and Borg-Warner launched a vigorous counterattack, arguing that the crash was caused by pilot error. On the day in question Rocky Mountain's chief pilot, Woodworth, was training Jerry James to be a logging pilot. Jere Calef was James's co-pilot in charge of monitoring the flight instruments while James was lifting the logs. Normally, the best method to lift logs is for the helicopter to center itself over the logs and then lift vertically until the logs are above the tree line. Bell and Borg-Warner argued that the pilots here did not use this method, instead they were teaching James to "fly away" the logs. This procedure, which all the pilots agreed was exceedingly dangerous, can be used when the logs are located in a clearing. Instead of using a vertical lift, the pilot starts a little behind the load to build up speed and flies horizontally, jerking the load off the side of the mountain and into the air. Bell and Borg-Warner argued that while engaged in this procedure, the load either snagged on the ground or was too heavy, causing the engine to overtorque and lose rotor speed. Bell and Borg-Warner asserted that if the loss of rotor speed had occurred while the pilots were engaged in a simple vertical lift, the pilots simply would have landed in the clearing instead of flying down the mountain to crash into 120 foot tall fir trees. The jury was evidently convinced by Bell and Borg-Warner, replying to special interrogatories that the pilots failed to maneuver the helicopter properly, failed to properly train and supervise James, and overloaded the helicopter. The jury also assessed Rocky Mountain's negligence at 100%.
 
 THE PRODUCTS LIABILITY CLAIMS
 
 6
 Rocky Mountain argues that the district court erred in dismissing its products liability claims. The district court dismissed these claims because Rocky Mountain was suing only for damages to the helicopter itself, and under the laws of Texas and Illinois, such damages are not recoverable in a products liability action. In reviewing the dismissals, we must review the district court's choice of law conclusions, and its construction of the applicable state law.
 
 1. Choice of Law
 
 7
 This diversity case first entered the federal courts in California, where it was transferred to Texas pursuant to 28 U.S.C. § 1404(a). A 1404(a) transfer does not effect a transfer of state law, Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), so California choice of law rules apply. Klaxon v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
 
 
 8
 California has adopted the "governmental interest" approach in determining choice of law questions. Offshore Rental Co. v. Continental Oil Co., 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978); Reich v. Purcell, 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967). This analysis requires that the court "search to find the proper law to apply based upon the interests of the litigants and the involved states." Offshore Rental, 22 Cal.3d at 161, 148 Cal.Rptr. at 869, 583 P.2d at 723. Currie, Notes on Methods and Objectives in the Conflicts of Laws, 1959 Duke L.J. 171, (1959) (hereinafter Methods and Objectives ). Upon determining the relevant policies of the respective states, the court must then inquire whether the states' policies conflict, and whether both states have an interest in having their law apply. Bernhard v. Harrah's Club, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719, cert. denied 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976); Hurtado v. Superior Court of Sacramento County, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).
 
 
 9
 Several different situations can arise in the comparison of the states' policies: (1) the "false conflict," in which the court finds that only one state is truly interested in having its law apply, McDougal, Comprehensive Interest Analysis Versus Reformulated Governmental Interest Analysis, 26 U.C.L.A.L.Rev. 439, 482 (1979); e.g. Hurtado, 11 Cal.3d at 580-1; 114 Cal.Rptr. at 109-10, 522 P.2d at 669-70 (Mexican plaintiff suing a California defendant would not be barred by Mexican rule limiting wrongful death damages since that rule was intended only to protect Mexican defendants from excessive judgments); (2) apparent conflicts in which, on the surface, the states' policies conflict, but a more restrained interpretation of the policies avoids the conflict, Methods and Objectives at 178; and (3) actual or true conflicts in which the policies of the states collide, and the court is forced to make a choice between the states' laws. E.g. Offshore Rental, 22 Cal.3d at 164, 148 Cal.Rptr. at 871, 583 P.2d at 725 (Louisiana's policy of protecting Louisiana companies from suits for business loss caused by negligent injury to another company's employees conflicts with California's policy of allowing California employers to recover for such losses). In resolving a true conflict, California has adopted the comparative impairment approach, in which the court:
 
 
 10
 Attempts to determine the relative commitment of the respective states to the laws involved. The approach incorporates several factors for consideration: the history and current status of the states' laws; the function and purpose of those laws.
 
 
 11
 Offshore Rental, 22 Cal.3d at 166, 148 Cal.Rptr. at 873, 583 P.2d at 727.[2] Baxter, Choice of Law and the Federal System, 16 Stanford L.Rev. 1, 20 (1963). The court in essence determines which state's policy would be more (or less) impaired if the other state's policy were applied.
 
 
 12
 A. Rocky Mountain v. Bell: Governmental Interests of Utah and Texas
 
 
 13
 The issue presented to this court is whether damages solely to the product itself can be recovered in a products liability action. The first step in our analysis is to determine the interests of the states involved: Texas, Bell Helicopter's residence, and Utah, the residence of Rocky Mountain.
 
 
 14
 Texas distinguishes between economic loss and physical harm. Physical harm (as contained in § 402A of the Restatement (Second) of Torts) to the plaintiff or to his property other than the product is recoverable in a products liability action. Two Rivers Co. v. Curtiss Breeding Service, 624 F.2d 1242, 1245 (5th Cir.1980), cert. denied 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981) (collecting cases).
 
 
 15
 However, a suit involving only the product itself falls in a class by itself under Texas law. In Nobility Homes of Texas, Inc. v. Shivers, 557 S.W.2d 77 (Tex.1977), the court held that a suit over a poorly constructed mobile home was for recovery of pure "economic loss"[3] and that such losses were not compensable in a products liability action. This was based on the court's view that "economic loss is not 'physical harm' to the user or his property." Id. at 80.
 
 
 16
 Texas addressed the issue of physical damage to the product itself in Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc., 572 S.W.2d 308 (Tex.1978). The buyer of a rebuilt airplane sought to recover damages to the plane arising out of its crash. The court, while recognizing that the product had caused physical harm to itself, accepted the argument that there is "no difference between a product that is unusable because of a defect and one that causes physical harm to itself because of a defect." Id. at 311. The court therefore merged the two concepts, holding:
 
 
 17
 In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss....
 
 
 18
 Id. at 313. The court's rationale was that:
 
 
 19
 [D]amage to the product itself is essentially a loss to the purchaser of the benefit of the bargain with the seller. Loss of use and cost of repair of the product are the only expenses suffered by the purchaser. The loss is limited to what was involved in the transaction with the seller, which perhaps accounts for the Legislature providing that parties may rely on sales and contract law for compensation of economic loss to the product itself.
 
 Id.[4]
 
 20
 Texas has exhibited several policies in deciding to prevent recovery for these types of losses. The principal policy is a desire to separate products liability from contracts and the law of sales. The court specifically noted the adoption of the U.C.C., which provides "a complete framework of rights and remedies for contracting parties." Id. at 312. The court felt that to allow products liability to supplant the contractual warranties agreed upon by the parties:
 
 
 21
 Would frustrate the Code's purposes of codifying the law of commercial transactions by displacing its applicability in all cases where the sale of faulty products is involved.
 
 
 22
 Id.
 
 
 23
 Apart from separating tort and contract law, this policy also promotes certainty and predictability, allowing Texas individuals and corporations to know that their contractual arrangements will be enforced. This rule also protects Texas defendants from potential liability for products on which the warranty has long since expired and for which the defendant may not have provided.
 
 
 24
 Another policy exhibited in Mid Continent is a desire to limit products liability in the context of commercial buyers and sellers. The court noted that "[s]trict liability arose initially to compensate consumers for personal injuries ...," id., (emphasis added) as a way to protect consumers who were not acquainted with "the intricacies of sales law." Id. This concern does not arise with commercial parties experienced in these "intricacies" and able, by contract, to protect themselves.
 
 
 25
 We now turn to Utah to determine if it has spoken to this issue, and if so, what policies it has evinced. Rocky Mountain asserts that Utah has, impliedly at least, adopted the view that damage solely to the product itself may be recovered in a products liability action.
 
 
 26
 Until recently, Utah had not even decided if products liability was a viable cause of action. While federal courts predicting what Utah would do had allowed products liability claims, e.g. Rigby v. Beech Aircraft Co., 548 F.2d 288 (10th Cir.1977), until Ernest W. Hahn, Inc. v. Armco Steel Co., 601 P.2d 152 (Utah 1979), the issue remained unsettled. In Hahn, the Utah court specifically adopted Section 402A of the Restatement (Second) of Torts.
 
 
 27
 Rocky Mountain asserts that Hahn also decided, sub silentio, that damages to the product itself are recoverable. It makes this assertion based on the damages for which the plaintiff in Hahn sued. In Hahn, plaintiff owned a shopping mall whose roof collapsed in a snow storm. Defendant had subcontracted to provide the steel joists that were incorporated into the roof. Plaintiff requested:
 
 
 28
 Damages incurred in the restoration of the collapsed area, for remedial measures required ... in the non-collapsed area of the mall, for lost amounts claimed by the tenants while the business was closed, and for the lost income from the tenants during that time.
 
 
 29
 Id. at 155. Rocky Mountain asserts that these damages are all economic losses, and that therefore Utah endorses recovery of economic losses in products liability actions.
 
 
 30
 While this argument is ingenious, it does not persuade us. First of all, issues regarding the recovery of damages were not before the court in Hahn. The parties stipulated to the amount of damages, and no specific charges were levelled against the elements therein. Also, we think it highly unlikely that the court would decide such a controversial question without some discussion of the matter.
 
 
 31
 This conclusion is strengthened by W.R.H., Inc. v. Economy Builders Supply, 633 P.2d 42 (Utah 1981), in which the court decided that in a negligent manufacturing suit, economic losses for damage to the product were recoverable. However, the court specifically noted that:
 
 
 32
 Whether or not a manufacturer should be held to a standard of strict liability for economic losses resulting from the failure of his product to fulfill the commercial needs of his purchaser is not at issue in the present case.
 
 
 33
 Id. at 45. The court treated this question as open, undercutting Rocky Mountain's thesis that Hahn had already settled this question.[5]
 
 
 34
 Utah, accordingly, does not have any expressed policy on the recovery of damages to the product in a strict liability action. Utah does, however, have an interest in seeing that its citizens are compensated.
 
 
 35
 We now turn to the question of which state has an interest in having its law applied. Hurtado, 11 Cal.3d at 581, 114 Cal.Rptr. at 110, 522 P.2d at 670. This case presents what has been termed a "false conflict," i.e., only one state has an interest in having its law apply--Texas. The only interest identified on Utah's part, providing compensation for its injured citizens, is not necessarily affected by the application of Texas rule, since the Texas rule does not preclude the plaintiff from obtaining compensation, but merely relegates recovery to different causes of action. It is also clear that the policies behind the Texas rule would be severely hampered if Texas law did not apply here. As the district court said:
 
 
 36
 The policies behind the Texas rule are very pertinent to this case. Defendant Bell is a Texas citizen, the contract ... may have been entered into in Texas, the aircraft contracted for were manufactured and certified in Texas, and plaintiff took delivery of the helicopters in Texas. Thus, most of the events Texas intended to impact through its policy change took place in the state.
 
 
 37
 Rocky Mountain Helicopters, Inc. v. Bell Helicopter Co., 491 F.Supp. 611, 618 (N.D.Tex.1979). Since Texas law applies, the district court was clearly correct in dismissing Rocky Mountain's products liability claim against Bell.[6]
 
 
 38
 B. Rocky Mountain v. Borg-Warner: Utah v. Illinois
 
 
 39
 We now turn to Rocky Mountain's products claim against Borg-Warner. Since Utah's interests are minimal here, the governmental interest analysis boils down to whether Illinois has addressed this issue.
 
 
 40
 In Moorman Manufacturing Co. v. National Tank Co., 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), the plaintiff sued under a strict liability theory for economic losses. The court held that strict liability did not provide a basis for recovering purely economic losses. The court's reasoning was similar to Mid Continent, relying on the enactment of the U.C.C. and the need to protect commercial defendants from liability "for business losses of other purchasers caused by the failure of the product to meet the specific needs of their business, even though these needs were [not] communicated ...." 91 Ill.2d at 79, 61 Ill.Dec. at 750, 435 N.E.2d at 447. Also, to impose products liability would disturb the certainty and predictability necessary in business transactions. The court also noted that imposing products liability in this situation would also damage the consuming public by "requiring [it] to pay more for their products so that a manufacturer can insure against the possibility that some of his products will meet the business needs of his customers." 91 Ill.2d at 79, 61 Ill.Dec. at 751, 435 N.E.2d at 448. Therefore, Illinois' policies dictate that its law apply.
 
 
 41
 Rocky Mountain's products liability claim against Borg-Warner is not as easily dismissed as the claim against Bell, however, because the Illinois courts do distinguish between pure economic loss and "physical damage" to the product itself. This distinction arises out of the language of § 402A, that:
 
 
 42
 One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused ....
 
 
 43
 Physical harm to the product is defined as damage occasioned by "an accident 'involving some violence or collision with external objects.' " Moorman, 91 Ill.2d at 83, 61 Ill.Dec. at 752, 435 N.E.2d at 449, quoting Economic Loss at 918. Economic loss, on the other hand, is defined as "[D]amages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits ...." Moorman, 91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449, quoting Economic Loss at 918.
 
 
 44
 The court distinguished between these two concepts by stating that whether a particular occurrence is "physical damage" or economic loss "depends on the nature of the defect and the manner in which the accident occurred." Moorman, 91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449. The court quoted with approval the third circuit's formulation of the test:
 
 
 45
 In cases ... where only the defective product is damaged, the majority approach is to identify whether a particular injury amounts to economic loss or physical damage. In drawing this distinction, the items for which damages are sought, such as repair costs are not determinative. Rather, the line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose.
 
 
 46
 Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1173 (3d Cir.1981).
 
 
 47
 On the facts before it, the Moorman court held that the loss involved constituted economic loss. The case involved a crack in a steel plate of a grain-storage tank which was discovered when the tank was emptied. The court held that "[t]his was not the type of sudden and dangerous occurrence best served by the policy of tort law that the manufacturer should bear the risk of hazardous products." Moorman, 91 Ill.2d at 85, 61 Ill.Dec. at 753, 435 N.E.2d at 450.
 
 
 48
 Applying these tests, we conclude that the accident here falls within the fold of "physical damage." The nature of the defect here is a faulty clutch in a helicopter. Such a defect is, by its very nature serious because of its key function in the drive system of the helicopter. The type of risk that arises here is also traditionally associated with tort law. A helicopter crash usually involves not only a risk of damage to the helicopter itself, but serious risk of personal injury to pilot and passengers.[7] Also, the manner of the injury, a helicopter crash, would seem to be a "sudden and dangerous" event. We therefore hold that under Illinois law, Rocky Mountain's claim is one for physical damage, "best served by the policy of tort law," and Rocky Mountain may prosecute a products liability claim against Borg-Warner.[8]
 
 EVIDENTIARY ERRORS
 
 49
 Rocky Mountain complains that the district court erred in excluding numerous test results and recommendations that Bell conducted after the accident. The district court excluded the evidence under Fed.R.Evid. 407 concerning subsequent remedial measures. Rule 407 states:
 
 
 50
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.
 
 
 51
 Rocky Mountain argues that these tests were not connected with the helicopter crash, but were generated in the ordinary course of Bell and Borg-Warner's business. In addition, Rocky Mountain argues that the tests themselves are not "measures ... taken," and that it did not seek to prove that Bell actually replaced the clutch in the Model 214B helicopter.
 
 
 52
 Bell and Borg-Warner respond that the tests were initiated because of the helicopter crash, and that the tests were a necessary predicate to the remedial measures taken and should be excluded under Rule 407. The issue is complicated further by the fact that one of Rocky Mountain's claims was for negligent testing, and evidence of tests taken after the crash would seem to be "measure[s] ... which if taken previously would have made the event less likely to occur."
 
 
 53
 Bell and Borg-Warner also argue that even if the district court erred, this error was harmless. Fed.R.Civ.P. 61. They point out that the district court allowed Rocky Mountain to introduce several tests that were proposed prior to the accident but not approved and carried out until after it.
 
 
 54
 The resolution of these issues naturally depends on the nature of the tests themselves. Rocky Mountain, however, made no offers of proof in regard to these tests. Normally, "this circuit will not even consider the propriety of the decision to exclude the evidence at issue, if no offer of proof was made at trial." United States v. Winkle, 587 F.2d 705, 710 (5th Cir.), cert. denied 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); Fed.R.Evid. 103(a)(2).
 
 
 55
 Rocky Mountain argues that all it was required to do was "show in some fashion, the substance of [its] proposed testimony." Id. Rocky Mountain then argues that its description of these tests was sufficient to meet this standard.
 
 
 56
 We disagree. Rocky Mountain's statements about the excluded evidence are so general as to be meaningless. We also note that while the primary purpose of Rule 103(a)(2) is to enable the district court to rule correctly, the rule has another purpose: "to provide an appellate court with a record allowing it to determine whether the exclusion was erroneous or not." 10 J. Moore & H. Bendix, Moore's Federal Practice p 103.22 (2d ed. 1982). Given the state of this record, we decline to speculate on the complicated questions presented without sufficient knowledge of the true character of the evidence excluded.[9]
 
 
 57
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 *
 District Judge of the District of Massachusetts sitting by designation
 
 
 [1]
 Rocky Mountain also asserts that in a products liability suit, Fed.R.Evid. 407 does not preclude proof of subsequent remedial measures. This claim is foreclosed, however, by our recent opinion, Grenada Steel Industries, Inc. v. Alabama Oxygen Co., 695 F.2d 883 (5th Cir.1983), in which we held that Rule 407 applies equally to negligence and strict liability cases
 
 
 [2]
 Much of the governmental interest approach was first put forward by Professor Currie. However, in a true conflicts situation, Professor Currie indicated that the law of the forum should apply. While California did not adopt this approach, California cases make clear that the "forum has a definite interest in applying its own law." Kasel v. Remington Arms Co., 24 Cal.App.3d 711, 731, 101 Cal.Rptr. 314, 327 (1972). Since none of the parties nor the accident have California connections here, this interest does not come into play
 
 
 [3]
 Economic loss was defined as being both direct and consequential:
 Direct economic loss may be said to encompass damage based on insufficient product value, .... Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.
 
 
 [557]
 S.W.2d at 78, n. 1, quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917, 918 (1966) (hereinafter cited as Economic Loss )
 
 
 [4]
 In a case decided the same day as Mid Continent, the court allowed recovery for damages to the product itself in a products liability action if the product damaged other property. Signal Oil and Gas Co. v. Universal Oil Products, 572 S.W.2d 320 (Tex.1978). Recovery of these losses were based on the language of § 402A, which extends liability for defective products causing "physical harm ... to the ... consumer or his property." The court stated, "[t]o the extent that the product itself has become part of ... the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss." Signal, 572 S.W.2d at 325. (footnotes omitted). This distinction, while not relevant to Rocky Mountain's claims against Bell, may apply to the claim against Borg-Warner. See discussion infra at n. 8
 
 
 [5]
 The W.R.H. court did not specifically state that the issue was unsettled. The great pains the court took to distinguish negligent manufacture from products liability, however, convinces us that Hahn does not speak to the question here. For example, the court stated:
 Expansion of the strict liability doctrine and the attention it has received from both courts and commentators has obscured other approaches to products liability actions sounding in tort. However, some courts have recognized the valid distinction which remains between strict liability and negligent manufacture actions. Accepting this distinction several jurisdictions have allowed recovery for economic losses in negligent manufacture cases while denying such recovery under strict liability theories.
 
 
 [633]
 P.2d at 45. (footnotes omitted)
 
 
 [6]
 Rocky Mountain asserts that even though Utah's interest here may be slight, California's choice of law analysis is heavily weighted in favor of applying the law of plaintiff's residence. Rocky Mountain relies on Kasel, in which the court stated: "[w]here the real issue involved ... is compensation of the injured person, California courts have tended to apply the law of the place of the injured's domicile, finding that that state has the greatest interest in compensating its domiciliaries." 24 Cal.App.3d at 734, 101 Cal.Rptr. at 330. We note, however, that the court was referring to injured plaintiffs suing for personal injuries, as opposed to a commercial buyer. In situations involving corporate plaintiffs, California courts have not indulged this "tendency." For example, in Offshore Rental, the court concluded that Louisiana law should apply to a California corporation's claim for damages caused by the Louisiana defendant's negligent injury of one of plaintiff's key employees. In any event, this "tendency" is overcome by the lack of other Utah interests here in comparison to Texas' strong policies
 
 
 [7]
 In conjunction with this, we note that personal injuries did result from this crash, although they were not sued for. The testimony shows that at least two of the three pilots were hospitalized for a time
 
 
 [8]
 We also note that under Illinois law, even without the exception in Moorman, Rocky Mountain might have a valid cause of action against Borg-Warner for the damage to the helicopter itself. Rocky Mountain argues that Borg-Warner's clutch damaged not only itself, but other property, namely, the helicopter itself
 Under § 402A and Illinois law, a plaintiff can recover for physical harm to his person "or to his property." Thus, if a defective product damages other property, the damages to that other property may be recovered. See e.g. Redarowicz v. Ohlendorf, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982). It is also true that in Illinois, "strict liability extends to manufacturers, sellers, contractors, those who hold themselves out to be manufacturers, assemblers of parts and suppliers and manufacturers of component parts." Sipari v. Villa Olivia Country Club, 63 Ill.App.3d 985, 992, 20 Ill.Dec. 610, 616, 380 N.E.2d 819, 825 (1978); Wright v. Massey-Harris, Inc., 68 Ill.App.2d 70, 74, 215 N.E.2d 465, 467 (1966). For example, in Krammer v. Edward Hines Lumber Co., 16 Ill.App.3d 763, 306 N.E.2d 686 (1974), the plaintiffs sued both the manufacturer of scaffolding and the lumber company that supplied the lumber for a side rail. The court upheld a verdict against both defendants, stating that "strict liability is also applicable to suppliers of multipurpose products which are placed in the stream of commerce with knowledge of the product's intended use." 16 Ill.App.3d at 765, 306 N.E.2d at 688. This language would appear to apply to Borg-Warner, since it knew of Bell's intended use and the clutch used is installed in a variety of different vehicles.
 
 
 [9]
 Rocky Mountain asserted at oral argument that it did make sufficient offers of proof. The record does not support this assertion, however. Most of the documents offered were admitted, and the documents excluded are not described with any particularity. For example, plaintiff's exhibit 24 was excluded, and the only evidence in the record in regard to its contents is that it was a "static-load test," and the only reason we know this is that Judge Belew mentioned it