**RUDD CONSTRUCTION EQUIPMENT COMPANY, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**CLARK EQUIPMENT COMPANY, Defendant-Appellant, Cross-Appellee.**

**Nos. 82–5355, 82–5370.**

United States Court of Appeals, Sixth Circuit.

Argued May 26, 1983.

Decided June 1, 1984.

Rehearing Denied in No. 82–5355 July 27, 1984.

John A. Fulton (argued), Woodward, Hobson & Fulton, Louisville, Ky., Eben G. Crawford, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant-appellant, cross-appellee.

Richard M. Trautwein (argued), Barnett & Alagia, Louisville, Ky., for plaintiff-appellee, cross-appellant.

Before LIVELY, Chief Judge, ENGEL, Circuit Judge, and NEESE, Senior District Judge.[*]

ENGEL, Circuit Judge.

In this Kentucky diversity action, defendant Clark Equipment Company (Clark) appeals a judgment for $315,945, plus interest, in favor of plaintiff Rudd Construction Equipment Company, Inc. (Rudd) following a non-jury trial before Chief Judge Charles M. Allen of the United States District Court for the Western District of Kentucky. We affirm in part, reverse in part, and remand for modification of the judgment.

On March 29, 1978, Rudd, a heavy equipment dealer and distributor, purchased a Michigan 475B tractor shovel from Clark, the manufacturer, at the wholesale cost of $268,434 plus $7,479.88 freight. On August 21, 1978, the tractor shovel caught fire while being demonstrated at Plastics Universal Mine Number 2 in Kentucky. The tractor burned until the following day and was reduced to junk with a salvage value of $20,000. The evidence supports the trial judge's findings that the loss occurred when fluid from a ruptured hydraulic hose ignited upon contact with heat from the turbochargers. The hose was part of the original equipment of the machine and ruptured after less than 400 hours of demonstration use. Normally such a hose could be expected to last from 2,500 to 3,000 hours.

The evidence, therefore, supports a finding that the hose was defective at the time it was delivered, although there is no proof that either party knew that it was defective until the fire occurred. However, Clark had investigated similar fires, also resulting from hydraulic leaks, on a number of its 475 tractor shovels and had communicated its findings to Rudd by letter dated December 9, 1976. The machine's malfunction in this case closely parallels the malfunction of another 475B tractor shovel

[*] The Honorable C.G. Neese, Senior District Judge, United States District Court for the Mid- dle District of Tennessee, sitting by designation.

which gave rise to the litigation reported in *C & S Fuel, Inc. v. Clark Equipment Co.,* 524 F.Supp. 949 (E.D.Ky.1981).

In response to the fires, Clark modified its 475 tractor shovels, adding a protective sleeve designed primarily to catch the fluid from the hydraulic hose in the event of a rupture. The trial judge found that such a sleeve was not complicated or expensive, could have been installed as early as 1969 or 1970, and would have protected Rudd's machine from fire by preventing hydraulic fluid from reaching the area where it was ignited. At the time Rudd bought the machine, Clark did not install protective sleeves in 475 tractor shovels, but it did offer purchasers fire suppression equipment as an option.

The sales agreement between Clark and Rudd contained the following limited warranty provision:

> There are no warranties, expressed or implied, AND THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, made by CLARK to DISTRIBUTOR on products or parts except as follows:

> CLARK warrants each new part of the product manufactured by it to be free from defects in material and workmanship under normal use and maintenance. CLARK'S sole obligation under this warranty shall be limited to replacing or repairing F.O.B. CLARK'S plant, or allowing credit for, at CLARK'S option, any new part which under normal and proper use and maintenance proves defective in material and workmanship within six (6) months after delivery to or one thousand (1,000 hours of ·use by the first ultimate user, whichever shall occur first; provided, however, that (i) the product is placed in use not later than one year after shipment from CLARK'S plant; (ii) notice of any such defect and satisfactory proof thereof is promptly and properly given by DISTRIBUTOR to CLARK; and (iii) such material shall have been returned to CLARK'S plant with transportation charges prepaid and found by CLARK to have been defective. No products shall be returned to said plant without the prior written approval of CLARK. This warranty does not apply to damage to or defects in any product caused by overloading or other misuse, neglect or accident, nor does this warranty apply to any product which has been repaired or altered in any way which, in the sole judgment of CLARK, affects the performance, stability or general purpose for which it was manufactured.

> THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES (EXCEPT OF TILE), EXPRESSED OR IMPLIED, AND THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL CLARK BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES.

> This warranty does not apply to parts, trade accessories, or to attachments not manufactured or sold by CLARK. DISTRIBUTOR shall rely solely on the existing warranties, if any, of the respective manufacturers thereof.

> ANY ACTION FOR AN ALLEGED BREACH OF ANY CONTRACT OF SALE OR OF THE ABOVE-STATED WARRANTY IN RESPECT OF PRODUCTS AND PARTS SOLD BY CLARK TO DISTRIBUTOR MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUED.

## I.

Given the foregoing facts, there are three arguably valid ways of measuring the damages to which Rudd may be entitled.

One theory would limit Clark's liability to that allowed under its written contract with Rudd for the sale of the machine. Since Clark and Rudd possessed relative parity of bargaining power, Clark argues force-

fully that under the Uniform Commercial Code, U.C.C. § 2–719, the parties were competent to agree to any allocation of the risk of loss and did in fact contract to limit Clark's liability. Clark urges, therefore, that the precise language of the contract should govern, displacing any other theory of damages. While acknowledging that a different rule might have applied had third parties been involved or had personal injuries been suffered, Clark maintains that Rudd should recover only the cost of the hose which ruptured, since only the product sold was damaged, and the parties had been aware of the possibility of this type of loss occurring.

A second theory, based on breach of warranty, would permit Rudd to recover the purchase price of the 475B tractor, $268,434, plus freight of $7,497.88, less the $20,000 salvage value. In support of this theory, Rudd has argued, and the trial judge agreed, that under Kentucky law, where the failure of a part of the machine has resulted directly in the loss of the whole, the machine is considered "one big defective part," *Cox Motor Car Co. v. Castle,* 402 S.W.2d 429, 431 (Ky.1966), entitling the purchaser to the net replacement value of the entire machine. The district court held in the alternative that, under the circumstances, the limited remedy of repair or replacement of defective parts could be said to have "fail[ed] of its essential purpose" within the meaning of Ky.Rev.Stat. § 355.2–719. It followed that Rudd was "entitled to judgment on its breach of warranty claim, with damages to be measured by the difference in value between the tractor shovel warranted and the one actually received." This measure of recovery may indicate that the trial court assumed that the damages resulting from the fire were not excluded by the language in the contract excluding "consequential or special" damages. Alternatively, the trial judge may have assumed that any limitation which would deny this recovery would also fail of its essential purpose under Ky.Rev. Stat. § 355.2–719.

In response, Clark asserts that the contractual language limiting Rudd's remedy to repair or replacement forbids recovery of the purchase price of the tractor shovel. Even absent such language, Clark argues, any amount over the cost of the ruptured hose would not be recoverable, since the damage to the remainder of the tractor shovel occurred as a result of the fire and, hence, is "consequential" damage excluded by other express language in the contract.

A third theory of recovery, based on tort principles, would permit as damages the amount which Rudd could probably have received from the resale of the tractor, less the salvage value. The trial judge found that the probable retail price which Rudd would have received for the machine had the fire not occurred was $335,945, and that the net recovery would therefore be $315,945. Judge Allen concluded that this amount was only recoverable under Rudd's theories of strict liability and common law negligence. Thus, the district court distinguished between the recovery of cost, on the one hand, and the recovery of special or economic loss, as reflected in the loss of the potential profit to be made from the sale of the machine, on the other. Only cost was viewed as recoverable under the breach of warranty theory. The district court held that since there was no contractual language excluding tort liability, Rudd was entitled to proceed upon a theory of strict liability or negligence. From Rudd's tort recovery of $315,945, we can infer that the trial judge believed that the contract's exclusion of consequential damages was no more effective in limiting damages in tort than in limiting damages for breach of warranty.

The theories upon which damages were awarded affected not only the measure of damages, but also the calculation of prejudgment and postjudgment interest. With respect to Rudd's recovery of the net purchase price on a theory of breach of warranty, the trial judge concluded that interest should be awarded on the net amount of this loss from the date the loss occurred, at least until the date of judgment. In contrast, Rudd's tort recovery included an award of loss of profits, which was unliqui-

dated and not ascertainable until the date of judgment. As to this additional amount, therefore, interest was awardable only from the date of judgment.

Finally, the trial judge took note of the fact that Kentucky's statutory allowance for postjudgment interest had been changed. Ky.Rev.Stat. § 360.040. He ruled that interest which accrued before July 1, 1982 was to be measured at the preexisting rate of eight percent, but interest after that date was to be calculated at twelve percent.

By way of cross-appeal, Rudd has challenged what is, in effect, the trial judge's refusal to compound interest in failing to provide that the prejudgment interest itself carry postjudgment interest. The parties agree that Kentucky law applies, but they disagree as to whether Judge Allen erred in not awarding compound interest.

## II.

This appeal demonstrates the problems faced in diversity cases when federal courts must predict state law without the security of appellate review by the state's highest court. The problem is particularly acute here, given the dearth of direct authority in Kentucky law on some of the issues, and the considerable variation in the treatment of like issues by the courts of different states. Indeed, there would appear to be a difference of opinion among the several states even in the applicability of the Uniform Commercial Code to the facts before us. *Compare Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173–74 (3d Cir.1981) (construing Pennsylvania law) *with Mid Continent Aircraft Corp. v. Curry County Spraying Service*, 572 S.W.2d 308, 312–13 (Tex.1978).

In resolving the several issues, we turn first to the district court's determination that, although the ruptured hose may have

been the only defective part, Rudd can recover the net purchase price of the entire machine under a breach of warranty theory.

It is undisputed that at the time of the fire, the machine was still under warranty and was in substantially the same condition as when delivered. Clark did not allege that the fire could be attributed to any abuse of the product or other misconduct on the part of the user. Had the tractor shovel been sold, it would have been sold as a new machine, and Clark would have furnished the purchaser with a new equipment warranty. The tractor shovel's hose would normally have been expected to last for 2,500 to 3,000 hours, and thus its failure to perform after approximately 400 hours supports the trial judge's finding that it was in fact defective. The question before us is whether Judge Allen erred in concluding that under the circumstances, he would not apply the warranty provision limiting Clark's obligation to the repair or replacement of the defective hose.

■■■■ Upon reflection, we conclude that we must respect the trial judge's determination of how this contract and the UCC would be interpreted by Kentucky's courts.[1] We begin with the proposition that in appellate review of diversity decisions, "considerable weight" is given to the opinion of the district judge sitting in the state whose law is being applied. *Diminnie v. United States*, 728 F.2d 301, 306 (6th Cir.1984); *Filley v. Kickoff Publishing Co.*, 454 F.2d 1288, 1291 (6th Cir.1972). The district judge will normally have a knowledge of that state's law and will have the resources for ascertaining it. In addition, the district judge will generally be sensitive to the principles and attitudes which pervade the law in that state. He is therefore in a better position to predict how the state's courts would resolve an issue,

---

**1.** The agreement provided that it "shall be construed and the legal relations between the parties determined in accordance with the laws of the State of Michigan ...." Both the parties and Judge Allen, however, appear to have relied primarily upon Kentucky law, and neither party argues on appeal that Michigan law should have applied. We therefore review the case under Kentucky law.

even though they may never have addressed it directly.

Illustrative of the district judge's reliance on Kentucky law in this case was his initial holding, based on *Cox Motor Car Co. v. Castle*, 402 S.W.2d 429 (Ky.1966), that where a machine "simply bursts into flame," the entire machine is, in the words of Cox, "one big defective part," *id.* at 431, entitling the plaintiff to recover the difference in value between the machine as warranted and the one actually received. Even though the facts in this case differ somewhat from those present in *Cox*, we do not believe it was unreasonable for Judge Allen to have concluded that the result here should be the same. True, the Court of Appeals of Kentucky (predecessor to the Supreme Court of Kentucky) recognized in *Cox* that under Kentucky's Uniform Commercial Code, and especially Ky.Rev.Stat. § 355.2–316 and § 355.2–719, "the parties could by contract exclude implied warranties and could limit remedies for breach of warranty." 402 S.W.2d at 431. The court also emphasized that the seller wrongfully refused to identify or even recognize the existence of any defective part in the vehicle in question and "tried to wash his hands of the whole thing." *Id.* Still, despite the existence of a limitation on remedies similar to the one here, the Kentucky court allowed as the measure of damages the "cost of replacing the truck with one not defective, which would be the same as the difference in market value." *Id.*

Judge Allen did not however rely solely upon *Cox.* He held in the alternative that the limited remedy of repair or replacement of the defective part had "failed of its essential purpose." This holding appears to rest on even stronger ground.

The relevant Kentucky provision, embodying section 2–719(2) of the Uniform Commercial Code, states: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." Ky.Rev. Stat.Ann. § 355.2–719(2) (Baldwin 1983). A "Kentucky Commentary" to section 355.2–719, which borrows the language of the Official Comment to the corresponding section of the Uniform Commercial Code, explains:

Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outline in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

*Id.*

In denying Clark's motion for reconsideration of a partial summary judgment in favor of Rudd on the breach of warranty claim, Judge Allen characterized the issue as follows:

Defendant has moved for reconsideration on grounds that the limited warranty in the contract between the parties cannot be said to have failed of its essential purpose. Defendant states:

"Admittedly, if Rudd had complained of problems in the hydraulic system and Clark had failed to correct them, and following its failure to correct the problem, the hose had ruptured and caused the fire which destroyed the machine, Clark would be liable (assuming the hose was defective) for the damages caused by the fire." See

Memorandum in support of Clark's motion for reconsideration, page 8.

This is a very clear statement of defendant's argument. If the part is defective to the extent that it gives advance warning of the defect, there is an opportunity for the seller to repair it, and the seller fails to repair it, then the limited warranty can be said to have failed of its essential purpose, pursuant to K.R.S. Sec. 355.2–719. On the other hand, if the part is even more severely defective, such that there is no opportunity for repair, defendant argues that the limited "repair and replace" warranty should remain in effect, although it is clear that under such circumstances the warranty has little value.

We cannot read either the Commercial Code or the Kentucky cases as requiring this anomalous result. In *Ford Motor Company v. Mayes,* 575 S.W.2d 480 (Ky. App.1978), the court quotes with approval from *Beal v. General Motors Corporation,* 354 F.Supp. 423, 426 (D.Del. 1973):

> "The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer, the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered."

The Court's holding herein is in accord with this analysis. The only difference here is that the defect was discovered simultaneously with the destruction of the machine.

In applying the Uniform Commercial Code, therefore, Judge Allen appears to have acknowledged that if *Cox* was not precisely on point, its result was persuasive here, especially in view of the construction placed upon the Code by the Kentucky Court of Appeals in *Ford Motor Co. v. Mayes,* 575 S.W.2d 480 (Ky.App.1978).

In *Mayes,* a married couple purchased a Ford truck. When noise and vibration problems developed, the couple returned the truck eight or nine times in a "fruitless" effort to eliminate the problem. *Id.* at 482. Finally, the couple determined that the truck frame was twisted and "diamonded" which "would cause excessive wear and tear to all moving parts of the truck." *Id.* They sought unsuccessfully to revoke their acceptance of the truck. They also refused to allow the Ford dealer to take the truck to its Louisville facilities for further diagnosis and, if necessary, "corrective repairs." *Id.* The court of appeals held that since the dealership had had an opportunity to correct the serious defect and did not do so, "[t]he purpose of the limited remedy of repair and replacement of defective parts had failed." *Id.* at 485.

Arguably, *Mayes* supports a finding that the repair or replace remedy failed of its essential purpose here because Rudd was unable to obtain "goods that conform[ed] to the contract within a reasonable time after a defective part [was] discovered." *Id.* at 484. However, unlike the dealership in *Mayes,* Clark was never afforded an opportunity to correct the defect. On the other hand, the fact that the hose was defective was not discovered in time for Clark to have had an opportunity to replace it. Beyond that, replacement of the ruptured hose would obviously have been "fruitless" in view of the near total destruction of the entire unit.

Pre-UCC Kentucky case law held that a sales agreement which undertook "to avoid practically every sort of warranty except the very limited one stated," the seller being obligated only to make good any defective parts, did not prevent the buyer from recovering the purchase price of a machine that proved "worthless for the purpose for which it was sold." *Myers v. Land,* 314 Ky. 514, 235 S.W.2d 988, 990–91 (1950). The distinction between the facts here and those in both *Mayes* and *Myers* is readily apparent. In the cited cases, the purchas-

ers appear to have been the ultimate users, and their lack of sophistication was clearly a consideration in the decisions. In contrast, Clark points out, Rudd is "a commercially sophisticated purchaser." Clark argues persuasively that, although the contractual allocation of risks in this case "might be construed to leave a less sophisticated non-merchant buyer with less than a minimum adequate remedy," Rudd must have understood the risk it was assuming by agreeing to the limited warranty.

Passing to authorities from other jurisdictions, we find support for both sides on the warranty issue. In *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.*, 617 F.2d 936 (2d Cir.1980), a DC–8 had crashed on takeoff in Moscow, causing extensive loss of life and the loss of the aircraft itself. It was conceded for the purposes of summary judgment that McDonnell's failure to install a springload or interlock which would have operated to guard against pilot error was one of the causes of the crash. In upholding the exclusive repair or replace remedy in the contract for the sale of the plane, the court noted the relatively equal bargaining positions and levels of sophistication of the manufacturer of the DC–8 aircraft, McDonnell, and the owner and operator, Japan Air Lines:

> JAL'S contractual remedy was fully available to it throughout the warranty period. It had copies of all the blueprints, drawings, overhaul manuals, and schematics of the plane; it inspected and approved the plane and did its own overhaul and repair work. It makes no claim that McDonnell was guilty of intentional fraud. It knowledgeably accepted and insured against the risk of McDonnell's negligence. Where two equal bargainers such as McDonnell and JAL agree as to the appropriate remedy for such negligence, they should be held to the terms of their bargain.

*Id.* at 941. Two facts distinguish *Tokio Marine* from this case. First, Rudd had no reason to know of the defect in the hydraulic hose until the fire actually broke out. Second, the warranty provision in *Tokio*

*Marine* was "negotiable and depended to some extent upon what its purchasers were willing to pay." *Id.* at 938.

*Russo v. Hilltop Lincoln-Mercury, Inc.*, 479 S.W.2d 211 (Mo.App.1972), also involved a machine which destroyed itself. There, the plaintiffs' new automobile was destroyed by fire "caused by either defective wiring or workmanship." *Id.* at 212. The defendant-dealer contended that it was not liable, because "plaintiffs failed to deliver the burned-out car to defendant for repair or replacement of defective parts." *Id.* The court of appeals pointed out that plaintiffs "did return the car immediately after the fire" and went on to reject the dealer's argument:

> Defendant argues that under the warranty its liability was limited to repairing or replacing defective parts. That provision of the warranty implies the car was repairable. Here it could not be; it was worthless junk. At trial time the defendant had the car, still not repaired. It would be ludicrous to require plaintiff to ask defendant to do the impossible. "Laws governing warranties, express and implied, should be so administered as to be fair to all parties concerned. Such warranties should be meaningful." *Jacobson v. Broadway Motors, Inc.*, Mo. App., 430 S.W.2d 602[4]

*Id.* at 213.

White and Summers consider *Russo* and *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir.1971), to be classic "failure of essential purpose" cases:

> There are probably relatively few situations where a remedy can fail of its essential purpose. Section 2–719(2) has been called into action most often in cases like *Riley* when the exclusive remedy involves replacement or repair of defective parts, and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition. Section 2–719(2) might also apply when the exclusive remedy requires performance of an act by the buyer that is precluded

by the seller's breach. For example, suppose an automobile manufacturer limits remedy to repair and replacement of defective parts if such parts are delivered to its plant. If the entire car is destroyed as a result of defective wiring, the buyer would be unable to return the wiring to the manufacturer's plant. Even if the buyer could return the defective parts, repair or replacement would not restore the car to working condition. The exclusive remedy would therefore fail of its essential purpose.[172]

---

[172] *Russo v. Hilltop Lincoln-Mercury, Inc.,* 479 S.W.2d 211, 10 UCC 768 (Mo.App.1972) (court allowed recovery of purchase price of car rendered unrepairable by fire despite exclusive remedy of repair or replacement).

J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code,* § 12–10, at 469 (2d ed. 1980).

In conclusion, although none of the cited cases is precisely on point, it can fairly be held that the construction of the Code urged by Rudd and adopted by the trial judge here constitutes a more reasonable prediction of what Kentucky courts themselves would do than the construction urged by Clark. We therefore agree with Judge Allen's determination that the "repair or replace" language of the contract failed of its essential purpose, especially since the defective part was small, and the defect resulted in the immediate destruction of the entire tractor shovel.

Although recovery under a breach of warranty theory is not precluded by the repair or replace provision, the question still remains whether the award of the purchase price of the tractor violates the separate provision in the contract stating that "in no event shall Clark be liable for consequential or special damages." That is, given the determination that the repair or replace warranty in the contract failed of its essential purpose, does the provision eliminating Clark's liability "for consequential or special damages" survive to preclude the award of any damages above the cost of the ruptured hose? Or are such damages not precluded, either because they are not "consequential or special," or because this provision, insofar as it did exclude such damages, also failed of its essential purpose?

White and Summers would classify most of the fire damage in this case as consequential:

> [I]n *Russo v. Hilltop Lincoln-Mercury, Inc.,*[53] defective wiring caused a fire which destroyed the buyer's new automobile. The court awarded the buyer the full purchase price of the automobile without identifying that portion of the price which represented recovery for consequential damages. Only the difference between the automobile's warranted and actual value at the time of acceptance could be recovered as general damages under 2–714(2). The defective wiring system reduced the actual value of the automobile at the time of acceptance below the purchase price, but the defect did not render the auto worthless as of the acceptance date. A large part of the fire damage was therefore consequential. Had the parties excluded consequentials by contract, the court would have had to identify the value differential component of the buyer's total loss.[54]

---

[53] 479 S.W.2d 211, 10 UCC 768 (Mo.App. 1972).

[54] Whenever a defective component part causes an accident that damages the entire product, a large part of the total damage may be consequential.

J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 10–4, at 386–87 (2d ed. 1980).

The trial judge did not analyze his award of the net replacement value in terms of whether it was for "direct" or "consequential" damage. Nonetheless, his analysis of Kentucky case law makes it clear that regardless of how the fire damage is characterized, to the extent that express limitations in the contract precluded the owner in these circumstances from recovering at least the purchase price of the truck, such limitations were ineffective under Ky.Rev. Stat. § 355.2–719(2).

## III.

If we agreed with the trial judge that Rudd is entitled to a greater measure of recovery on its tort theories than on its breach of warranty theories, then we would have to resolve a difficult and controverted issue under the UCC: Can a commercial buyer recover damages in tort from the seller if the only injury is to the chattel which was the subject of the sales contract?

A number of recent cases support Clark's argument that no recovery in tort may be had, especially when both of the contracting parties are large commercial entities. *See, e.g., Mid Continent Aircraft Corp. v. Curry County Spraying Service,* 572 S.W.2d 308 (Tex.1978); *Scandinavian Airlines System v. United Aircraft Corp.,* 601 F.2d 425 (9th Cir.1979) (construing California law); *Airlift International, Inc. v. McDonnell Douglas Corp.,* 685 F.2d 267 (9th Cir.1982) (construing California law); *Marcil v. John Deere Industrial Equipment Co.,* 9 Mass.App. 625, 403 N.E.2d 430, 434 (1980). Other cases support Judge Allen's application of tort principles to the injury in this case. *See, e.g., C.D. Herme, Inc. v. R.C. Tway Co.,* 294 S.W.2d 534 (Ky.1956); *C & S Fuel, Inc. v. Clark Equipment Co.,* 524 F.Supp. 949, 951–52 (E.D.Ky.1981); *Hardly Able Coal Co. v. International Harvester Co.,* 494 F.Supp. 249, 251 (N.D.Ill.1980) (construing Kentucky law); *James v. Bell Helicopter Co.,* 715 F.2d 166, 173–74 (5th Cir.1983) (construing Illinois law); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3d Cir.1981) (construing Pennsylvania law).

However, we find it unnecessary to address this issue here, because as the following discussion shows, we conclude that, under the general law of damages, Rudd has failed to prove facts that would enable it to recover loss of profits as part of its strict liability and negligence claims.[2] As a result, a tort recovery would entitle Rudd to no more than the replacement value of the machine, which is equal to the amount of damages that Rudd can recover under its breach of warranty theory.

In calculating Rudd's recovery in tort, the district court found

> that the suggested price placed by Clark on the tractor shovel in question was $335,945 and that under the evidence, there existed the reasonable probability that the tractor shovel could have been sold for that amount had it not been for the fire. The evidence does reflect that no order had been placed for the tractor but that it was being demonstrated, and that after the fire the company to which it was demonstrated purchased another model from a source other than the plaintiff.

> We conclude that under the strict liability and negligence theories, defendant, having admitted that if it is liable under product liability it is liable under negligence law, plaintiff is entitled to judgment in the amount of $315,945 representing the difference between the price that it would have realized upon the sale of the tractor and the $20,000 salvage value.

Loss of profits would normally be considered consequential or special damages,

---

**2.** Clark strongly protests Judge Allen's statement that Clark "admitted that if it is liable under product liability, it is liable under negligence law" and denies that any of its concessions could be so construed. The following language in Clark's post-trial brief was apparently interpreted as an admission of negligence:

> There was no element of negligence liability which in the facts of this case requires less evidence than that which Rudd presented to establish liability under its strict liability count. Therefore, if the Court finds Rudd proved liability in the strict liability count, the question of liability in negligence is merely

academic, and if Rudd's evidence failed to establish liability in its strict liability count such evidence cannot be expected to have proved negligence liability.

We agree with Clark that it intended no such concession and that therefore Judge Allen's holding of negligence, which apparently was based solely upon that perceived admission, cannot stand. However, we also note that the absence of negligence is of no consequence unless Rudd's recovery under a negligence theory would be greater than its recovery under a breach of warranty theory.

and as such were expressly excluded under the terms of the contract. The trial judge ruled that "the failure of the defendant to include in the agreement any language pertaining to tort liability deprives it of any shelter from tort liability." However, we do not believe that a sophisticated, commercial buyer like Rudd can evade contractual language excluding liability for consequential or special damages simply by suing the seller in tort. Even assuming that loss of profits may be recoverable under a theory of tort liability, the question remains whether absent a sale Rudd may recover profits measured by the retail price at which the tractor shovel would probably have been sold.

■ Under Kentucky law, the measure of damages for injury to personal property is "the difference between the reasonable market value immediately before and immediately after the injury." *Ecklar-Moore Express, Inc. v. Hood,* 256 S.W.2d 33, 34 (Ky.1953); *accord, Hayes Freight Lines v. Hamilton,* 257 S.W.2d 60, 63 (Ky.1953). However, we have found no Kentucky case law showing whether, in determining reasonable market value before the injury, the correct measure is *wholesale* value or *retail* value. Because Kentucky does appear to place considerable confidence in the Restatement of Torts, *see, e.g., Nichols v. Union Underwear Co.,* 602 S.W.2d 429, 431 (Ky.1980), we look there for guidance. *See Garrison v. Jervis B. Webb Co.,* 583 F.2d 258, 262 n. 6 (6th Cir.1978). The Restatement (Second) of Torts § 928 (1979) states that a plaintiff entitled to judgment for harm to a chattel may recover "that difference between the value of the chattel before the harm and the value after the harm...." The term "value" is further defined in section 911:

(1) As used in this Chapter, value means exchange value or the value to the owner if this is greater than the exchange value.

(2) The exchange value of property or services is the amount of money for which the subject matter could be exchanged or procured if there is a market continually resorted to by traders, or if no market exists, the amount that could be obtained in the usual course of finding a purchaser or hirer of similar property or services. The rental value of property is the exchange value of the use of the property.

Comment d to section 911 explains:

d. *Wholesale or retail value.* From the time when a chattel is manufactured to the time of its actual use, there may be many markets in which it is sold. Thus, different prices are paid by the wholesaler, the retail dealer and the consumer. Since the measure of recovery is determined by the harm done, the market that determines the measure of recovery by a person whose goods have been taken, destroyed or detained is that to which he would have to resort in order to replace the subject matter. *Thus the consumer can recover the retail price; the retail dealer, the wholesale price.* The manufacturer, who does not buy in a market, receives his selling price. *Damages for the profits that the wholesale dealer or the retail dealer would normally anticipate from a sale are not ordinarily allowed. However, if the dealer has made a contract to sell certain goods that another has destroyed, taken or detained and he has been unable to obtain similar goods for delivery to the purchaser, he is entitled to recover damages for the loss of profits thus caused,* if he can satisfy the requirement of certainty. (See § 912). Likewise, a consumer or user may recover for the harm done through the loss of use of the chattel until he can obtain a substitute; the dealer or manufacturer is entitled to damages for any harm done to his business through his inability to obtain substitutes and thus satisfy his customers. (See § 927).

(emphasis added).

While we find nothing in Kentucky law on this issue, at lease three relatively recent state court decisions elsewhere support the view that a retailer is normally entitled to recover only the cost of replacement, or wholesale value, of a chattel, at

least where the chattel is replaceable. *See Millison v. Ades of Lexington, Inc.*, 262 Md. 319, 277 A.2d 579, 582–84 (1971); *Dubiner's Bootery, Inc. v. General Outdoor Advertising Co.*, 10 A.D.2d 923, 200 N.Y. S.2d 757 (1960); *Whaley v. Crutchfield*, 226 Ark. 921, 294 S.W.2d 775, 778–79 (1956). Both the *Millison* and the *Whaley* opinions include the following quotation from 1 *Sedgwick on Damages* § 248a, at 500–01 (9th ed. 1912):

"When in the ordinary case a value is to be found for a single thing, the value is what that single thing would sell for; which amounts to the retail value of it. But when a court is dealing with a stock of goods held for sale, or even with a portion of such a stock, the value to be found is its value as a stock or part of a stock of goods, that is, its wholesale value, without the profit of resale which enters into the retail value; for at the time of valuation that profit has not yet been earned, or, to put the matter in another way, the process of distribution, which brings the goods into the hands of the consumer and thus gives them their final increment of value, has not yet taken place."

The only recent case we have found to the contrary is *Ishee v. Dukes Ford Co.*, 380 So.2d 760, 761 (Miss.1980), which ruled that the retail seller may recover "the total diminution in retail market value proximately caused by the defendant's tort."

As the Maryland Court of Appeals pointed out in *Millison*, to award the retailer the retail value of his destroyed goods would overcompensate him, since it would enable him to earn a profit without having incurred the expense of selling the goods. 277 A.2d at 583–84. For example, if a fire totally destroyed a store owner's stock, the proper measure of the owner's loss would not be the marked up retail value of the property thus destroyed but rather the cost to him of replacing of the goods, plus any damages attributable to the interruption of his business. According to comment d to section 911 of the Restatement, a retail dealer is awarded profits only if he has made a contract to sell certain goods and is unable to obtain similar goods for delivery to the purchaser. We therefore look to the proofs in this case and the specific findings made by the trial judge to determine whether this exception applies. We conclude that it does not.

The proof at trial was that at the time of its loss, the tractor shovel was located at a Plastics Universal Corporation mine in Kentucky, where it was being demonstrated. Plastics Universal had indicated an interest in buying the machine and, in fact, had previously acquired two other 475 tractor shovels. Although the machine had been used in demonstration for approximately 400 hours, no order had been placed for it. There was some evidence in the form of opinion and hearsay testimony of Rudd's General Service Manager, Mr. Robert Carter, that Plastics Universal would probably have purchased that machine had the fire not occurred. Mr. Carter also testified that Rudd had never had a 475 tractor shovel that it was unable to sell. The trial judge did not find that the tractor shovel would have necessarily been sold to the specific party to whom it was being demonstrated. Admittedly, the evidence of Rudd's prior experience retailing 475 tractor shovels supports the trial judge's finding that absent the fire, Rudd would probably have sold the tractor shovel for the suggested retail price. But this alone, absent more specific proof, is not sufficient in our opinion to place the measure of damages higher than the replacement cost to Rudd, a cost measured by the wholesale price. Moreover, there was no showing that another 475B tractor shovel could not have been acquired from Clark had Rudd found a ready purchaser.

**IV.**

The district court in entering final judgment made two computations of interest and failed to make a third, which is the subject of Rudd's cross-appeal. The district court first awarded Rudd prejudgment interest at the rate of 8 percent per annum on the sum of $255,913.88, the wholesale value of the tractor, less salvage, from the

date of the loss, August 21, 1978 to the date of judgment, March 30, 1982. The court's calculation of prejudgment interest came to $73,907.93. It also awarded postjudgment interest on the principal sum of $255,913.88 at the rate of 8 percent until July 1, 1982, after which time any unpaid judgment would bear the rate of 12 percent, reflecting the change on that date of Kentucky's legal interest on judgments. Rudd argues that the final judgment should have included postjudgment interest not only on the principal sum, but also on the prejudgment interest, which was unpaid as of the date of judgment.

 The relevant statute in Kentucky is Ky.Rev.Stat. § 360.040 which on the date of judgment provided:

> A judgment shall bear eight percent (8%) interest from its date. A judgment may be for the principal and accrued interest; but if rendered for accruing interest, it shall bear interest only according to its terms. Provided, that when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than eight percent (8%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than eight percent (8%). All interested parties must have due notice of said hearing.

Clark cites *Western Casualty & Surety Co. v. Meyer*, 301 Ky. 487, 192 S.W.2d 388, 394 (1946), as authority for the rule that a decision to award postjudgment interest on accrued prejudgment interest is entirely within the discretion of the trial court. That is our construction of the statute, and we are shown no authority to the contrary. Furthermore, in reviewing the decision of a district court judge sitting in Kentucky, we are not disposed to disturb his judgment on a matter of Kentucky law when his conclusion finds some support in the case law of the state. Accordingly,

The judgment of the district court is AFFIRMED in part and REVERSED in part and REMANDED for a modification of the amended judgment, entered May 11, 1982, by substituting for the figure "$315,-945" in the second paragraph the correct figure of $255,913.88.